**Jon H. DeHAAN, Appellant–Petitioner,**

v.

**Christel DeHAAN, Appellee–Respondent.**

**No. 49A04–8912–CV–584.[1]**

Court of Appeals of Indiana,
First District.

June 12, 1991.

Rehearing Denied July 31, 1991.

---

1. This case was reassigned to this office on January 2, 1991.

Jerry P. Belknap, Edward O. DeLaney, Peter J. Rusthoven, Stanley C. Fickle, Jan M. Carroll, Barnes & Thornburg, Indianapolis, for appellant-petitioner.

Robert F. Zoccola, Alan S. Brown, Todd J. Kaiser, Locke Reynolds Boyd & Weisell, James A. Buck, James A. Reed, Darryn Duchon, Buck Berry Landau & Breunig, Indianapolis, for appellee-respondent.

RATLIFF, Chief Judge.

## STATEMENT OF THE CASE

Jon H. DeHaan (Jon) appeals the trial court's judgment in a dissolution action determining the true market value of certain property and distributing it between Christel DeHaan (Christel) and him, and Christel cross-appeals the court's judgment that Jon, during pendency of the appeal, receive interest and other benefits from money paid to him by Christel under the judgment. We affirm in part, reverse in part, and remand.

## ISSUES

1. Whether the court erred in the effect and consideration which it gave to the antenuptial agreement between the parties.

2. Whether the trial court erred, abused its discretion, and entered findings which are unsupported or are contrary to the evidence when the court awarded post-dissolution ownership and control of the stock of the closely-held corporation owned by the parties, ruled Christel should be awarded all of the stock, and ordered her to pay Jon for 50% of its value.

3. Whether the court erred and abused its discretion in considering the tax effects of the property division, in awarding immediate ownership and control of the stock to Christel while deferring the payment to Jon without ordering Christel to pay interest in the interim, and in rejecting Jon's offer to purchase Christel's Endless Vacations Systems, Inc. (EVS) shares tax-free.

Christel cross-appeals raising the following issue:

4. Whether the court erred by allowing Jon to receive, during the pendency of his appeal, interest and other benefits from money paid to him by Christel under the judgment.

## FACTS

Prior to the parties' marriage on July 16, 1973, they executed a two-page contract entitled Marital Property Agreement (antenuptial agreement). Jon filed for dissolution of marriage on February 23, 1987,

requesting special findings and conclusions pursuant to Ind.Trial Rule 52(A), and a bifurcated trial was held.

During the first stage of the trial, the trial court addressed the antenuptial agreement and found on May 20, 1988, that: 1) the antenuptial agreement barred only Christel's claims to spousal support but not her claims to Jon's property; 2) the agreement would be unconscionable if it covered property claims; 3) the agreement did not protect Jon's inheritance and, even if it did, it protected only the value of his inheritance at the time of marriage; 4) the EVS stock had become dissociated from Jon's inheritance which had purchased the stock; and 5) the court should determine a fair and equitable property division according to the statute then in effect, IND.CODE § 31–1–11.5–11.

During the second stage of the trial, the trial court addressed the value of EVS, the portion of EVS's value which each party should receive, and the question of control and ownership of EVS. The court found on May 15, 1989, that: 1) EVS's true fair market value was $135,000,000; 2) each party had contributed equally to EVS and, therefore, the value of the EVS stock should be divided equally between them; and 3) Christel should be awarded control of EVS. The court ordered Jon immediately to transfer his EVS shares to Christel and ordered her to pay Jon either $67,500,-000 before taxes or approximately $46,500,-000 after taxes if she decided to pay the taxes. However, the court ordered that Christel's payment be made "within sixty-one (61) days after the final resolution of these proceedings and any possible appeals." Record at 208. The order did not provide for interest on Christel's payment, for income to Jon after the order and during appeal, or for security to Jon. The judgment also dissolved the marriage, incorporated by reference the May 20, 1988, judgment on the validity and effect of the antenuptial agreement, and incorporated the parties' stipulations on child support and division of property other than EVS.

Jon sought clarification of the May 15, 1989, judgment and a stay, pending appeal, of the transfer to Christel of his EVS shares and control of EVS. After hearings, on July 13, 1989, the court denied the stay and entered an order repeating that Christel had an option of paying Jon $67,-500,000 pre-tax or approximately $46,500,-000 after-tax; requiring Christel to pay the amount into an escrow account within 90 days of May 23, 1989, with earnings on the escrow accruing in Jon's favor; and affirming Christel had immediate control of EVS.

Jon filed a motion to correct errors on July 13, 1989, protesting the court's authorization to Christel to deduct more than $20,000,000 for taxes if she chose. On August 4, 1989, Christel paid $46,500,000 into escrow. The court held a hearing on the motion to correct errors on August 23, 1989, and entered an order on September 7, 1989, which amended its May 15, 1989, judgment and its July 13, 1989, order. The court ordered Jon to determine his best after-tax position if $67,500,000 were paid to him that day. The court also stated Christel had the right of paying Jon that amount if there would be an advantage to her payment of taxes when she otherwise would not have to or if EVS would not suffer as much of a tax impact as Jon would. The court ordered the parties to try to agree on Jon's best after-tax position on a $67,500,000 payment; failing such agreement the court would hold a hearing on the matter.

Although Jon and Christel were able to agree that the transaction which occurred was not taxable to either party, they disagreed on other matters. Therefore, the court held an evidentiary hearing on October 20, 1989, after which it entered an order on November 16, 1989, amending the judgment and its prior orders. The court stated that it intended the after-tax option to place Jon in the position he would occupy if he were to receive a one-time cash payment through sale to an unrelated third party or through a court-ordered corporate redemption. The court determined Jon's best after-tax position from a one-time cash payment of $67,500,000 would be $47,384,-195 and ordered Christel to pay the $884,-195 difference from her previous payment into escrow on or before January 2, 1990.

The court concluded that its orders had equally divided the parties' EVS interest by awarding Jon $46,500,000 tax-free and by awarding Christel EVS stock with a value of $46,500,000. The court denied Jon's motion to correct errors on December 13, 1989. Jon then filed this appeal.

## DISCUSSION AND DECISION

*Issue One*

Jon contends the court erred in: 1) holding the antenuptial agreement does not preclude Christel's claim to part of his 80% share of EVS stock; 2) ruling that the antenuptial agreement would be unconscionable if it did; and 3) admitting and relying upon parol evidence, including evidence of events occurring after the execution of the antenuptial agreement and testimony regarding Christel's subjective and unspoken intent, to interpret the contract. He also contends the following findings and conclusions are unsupported by and are contrary to the evidence and/or are contrary to law and to public policy: Findings of Fact 4, 5, 14, 15, and 20, and Conclusions of Law 3, 4, 6, 7, 9, 11, 13 to 24, and 26 to 32 in the 1988 judgment and Findings 16(B), 16(D), and 31(A) in the 1989 judgment.

Christel contends the court correctly held the antenuptial agreement deals with matters of spousal and child support, protecting the inheritance which Jon brought to the marriage from Christel's claims for support and maintenance, and the agreement does not deal with the division of property acquired by the parties during their marriage. The trial court gave three rationales for its judgment, reasoning that the language of the antenuptial agreement and the parties' conduct at the time of and after execution, the dissociation of EVS stock from Jon's separate property, and the unconscionability of Jon's interpretation of the agreement all supported its judgment.[2]

When we review a case in which the trial court has made requested findings of fact and conclusions of law, we will not set aside the court's judgment unless it is clearly erroneous. *Rose Acre Farms, Inc. v. Greemann Real Estate* (1987), Ind.App., 516 N.E.2d 1095, 1097, *trans. denied.* A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Donavan v. Ivy Knoll Apartments Partnership* (1989), Ind.App., 537 N.E.2d 47, 50. In determining whether the findings and judgment are clearly erroneous, we will neither reweigh the evidence nor judge witness credibility, but we will consider only the evidence and reasonable inferences therefrom which support the judgment. *Agrarian Grain Co. v. Meeker* (1988), Ind. App., 526 N.E.2d 1189, 1191. A judgment is contrary to law if it is contrary to the trial court's special findings. *Id.*

"Antenuptial agreements are to be construed according to principles applicable to the construction of contracts generally." *Rose v. Rose* (1988), Ind.App., 526 N.E.2d 231, 236. To interpret a contract, a court first considers the parties' intent as expressed in the language of the contract. *City of Evansville v. Old State Utility Corp.* (1990), Ind.App., 550 N.E.2d 1339, 1342. The court must read all of the contractual provisions as a whole to accept an interpretation which harmonizes the contract's words and phrases and gives effect to the parties' intentions as established at the time they entered the contract. *Washington National Corp. v. Sears, Roebuck & Co.* (1985), Ind.App., 474 N.E.2d 116, 121, *trans. denied.*

*Construction of Contract Language*

Although the antenuptial agreement did not mention the size of Christel's estate before marriage, it recited that Jon had a

---

**2.** Because we dispose of this issue under the court's first rationale, we do not address the correctness of its alternative theories that the stock had become dissociated from Jon's estate or that the agreement was unconscionable.

Therefore, we need not discuss Jon's contentions that Findings of Fact 20 or Conclusions of Law 11, 13, 14, 22, and 24 of the 1988 judgment and 16(B), 16(D), and 31(A) of the 1989 judgment are clearly erroneous or contrary to law.

separate estate valued at $250,000.00 and it provided in part:

"WHEREAS, JON has a separate estate valued as follows, to-wit: ... $250,-000.00 ...

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS: That, in lieu of any and all future claims by CHRISTEL to alimony, either temporary or permanent, or to child support payments for Tim and Keith or any other payments or obligations whatsoever by JON, upon the termination of the contemplated marriage by divorce (if such event should occur) JON agrees and covenants that he will provide a home for CHRISTEL and her minor children by previous marriage, of a value of not more than $45,000.00, in full and complete discharge and satisfaction of all duties and obligations to support and maintain CHRISTEL and her minor children by previous marriage....

Both JON and CHRISTEL agree that this obligation above recited shall be the sole obligation of JON in the event of the termination of the marriage herein contemplated by divorce, and that this Agreement does not constitute a Contract to make a Will ..., but seeks only to define and delineate the full extent of all of the obligations of JON in the event of the termination of their contemplated marriage relationship by divorce."

Record at 664–65.[3]

■ The court concluded that the antenuptial agreement, despite its title "Marital Property Agreement" has little to do with marital property, *see* Conclusion of Law 3, Record at 148, and does not mention the value of Christel's estate upon marriage.[4] The court also concluded the language of the antenuptial agreement does not establish either Jon's or Christel's right to the

property they brought to the marriage, does not address the division of property acquired individually or jointly during marriage, and deals with the obligations of spousal and child support rather than with property division in the event of a divorce. *See* Conclusions of Law 6, 7, and 26.

In Conclusions of Law 8 and 9 the trial court concluded that because testimony from a linguist indicated the clause "in lieu of any and all future claims by CHRISTEL to alimony", Record at 664, did not specifically relate back to the "WHEREAS" clause reciting the value of Jon's separate estate, *see* Record at 664, Jon had relied on the word "alimony" to establish his right to a separate estate in lieu of giving Christel a $45,000.00 house.

The court further concluded in Conclusions of Law 16–20 that interpretation of the word "alimony" to mean spousal support makes more sense in the context of the paragraph in which it appears than to interpret the word to mean property settlement. Interpretation of "alimony" as spousal support also harmonizes the contract as a whole. The court concluded in Conclusions of Law 17 and 18 that the words "either temporary or permanent" immediately following the word "alimony" in the agreement, Record at 664, and the language stating that Jon will provide a house for Christel and her minor children to discharge "all duties and obligations to support and maintain Christel" and her children, Record at 665, lend credence to its interpretation of "alimony" as spousal support. In addition, the court concluded in Conclusion of Law 17 that the phrase "payments and obligations", Record at 664, also indicates payments for spousal support instead of an obligation to make a property settlement.

Conclusion of Law 4 in which the court concluded Christel had an estate of $60,000.00. Clearly, the value of Christel's estate was not mentioned in the agreement. Whether her estate was worth $60,000.00 or some lesser value is immaterial in light of the current value of the marital estate and the court's disposition of the issue. Therefore, we do not address Jon's protest further.

---

**3.** In Conclusion of Law 30, the court determined Jon had adopted Tim and Keith but they were emancipated so that Jon had no duty to pay child support for them or to pay spousal support.

**4.** Jon contests Finding of Fact 5 in which the court stated that the value of Christel's estate at the time of marriage was not mentioned in the antenuptial agreement but was $60,000.00 and

While recognizing that *Shula v. Shula* (1956), 235 Ind. 210, 132 N.E.2d 612, cited by Jon to the trial court, stated that alimony in Indiana was solely for property settlement, the trial court concluded that other Indiana cases, specifically *Wellington v. Wellington* (1973), 158 Ind.App. 649, 304 N.E.2d 347, *trans. denied,* and one line of Indiana cases cited within, indicated that "alimony serves a dual purpose—a method to aid in the equitable distribution of property and a method to provide continued maintenance or support if deemed appropriate." *Id.* at 660, 304 N.E.2d at 353. *See* Conclusion of Law 15, Record at 151.

Jon attacks the court's conclusions, arguing that courts favor antenuptial agreements and honor them as written. Jon relies on *In Re Marriage of Boren* (1985), Ind., 475 N.E.2d 690, 694, noting that the court enforced the agreement although it was harsh and left the wife with only $45,000 whereas her spouse retained more than $3,000,000. Nevertheless, unlike the agreement in the present case, the agreement in *Boren* provided that "each party retain sole ownership, control and enjoyment of and have the exclusive right to dispose of all his property then owned or which might thereafter be acquired." *Id.* at 692. However, Jon cites *Rose,* 526 N.E.2d at 231, for the proposition that an antenuptial agreement may protect parties' separate property acquired during the marriage even if the terms do not refer expressly to it. Nevertheless, unlike the antenuptial agreement in the present case, the agreement in *Rose* specifically stated that neither party would make any claim by way of property settlement upon the estate or property of the other and that each would own a one-half interest in any jointly-acquired real or personal property. Apart from its title of "Marital Property Agreement" and its recital of the value of Jon's estate, the antenuptial agreement in this case does not refer to property or to a property settlement.

Jon also attacks the court's conclusions, arguing: 1) the terms explicitly indicate Christel is giving up "any and all future claims" to "any ... payments or obligations whatsoever by Jon", Record at 664, in return for Jon's provision of a house to Christel as his "sole obligation", Record at 665; 2) the broad language of the agreement obviates the need to delineate the agreement's effect upon particular categories of property, such as property acquired during the marriage; 3) there is no legal requirement that a pre-nuptial contract address both spouses' property; and 4) the agreement does not need to spell out that Christel will keep her own property since the law in effect at the 1973 execution automatically awarded a wife her own property; 5) the court seized the words "alimony" and "obligations" out of context instead of harmonizing them with the agreement as a whole; and 6) Indiana law in 1973 indicated both "alimony" and "obligations" encompassed property settlement on divorce. In summary, Jon argues the agreement prevented Christel's claim to property acquired during the marriage, even though it did not expressly delineate protection for that or other particular categories of property.

After reviewing Jon's arguments and his citations to statutory and case law and to the record, we find the trial court properly construed and harmonized the various provisions of the contract instead of focusing on isolated phrases and the trial court correctly interpreted the agreement in light of the confusing state of the law of alimony existing at the time the agreement was executed. We do not find the court's Conclusions of Law 3, 6, 7, 9, 15–20, or 26 to be unsupported by the findings or clearly erroneous.

*Extrinsic Evidence of Parties' Intent*

In addition to construing the contractual language, the trial court considered parol evidence regarding the parties' conduct surrounding execution of the contract and during marriage in order to determine their intent in executing the antenuptial agreement. Jon argues the agreement is unambiguous and, therefore, the court erred in admitting the parol evidence. Jon concedes that if there is an ambiguity in the contract it is whether the agreement includes property claims or is limited to support claims.

However, he argues that the only relevant parol evidence shows the agreement covers property and bars any claim by Christel to property. In addition, he argues the parol evidence that both parties believed the agreement was intended to protect Jon's inheritance did not indicate the parties intended to protect only the value of his inheritance as opposed to protecting the specific assets within Jon's estate. Finally, Jon argues the parol evidence of the parties' conduct during the marriage was irrelevant and inadmissible because the parties' conduct during marriage did not constitute performance of the agreement, which was to be performed upon the breakup of the marriage, which performance could serve to show what the parties intended by the agreement or to assist the court in interpretation of the written expression of their agreement. Specifically, Jon attacks Findings 4, 14, and 15 and Conclusions 21, and 27–32 from the court's 1988 judgment.

■■■■ "If the contract is ambiguous or uncertain in its terms, then extrinsic circumstances and rules of contract construction may be employed to help construe the contract and ascertain the intent of the parties." *Rieth–Riley Construction Co. v. Auto–Owners Mutual Insurance Co.* (1980), Ind.App., 408 N.E.2d 640, 645, *trans. denied.* To interpret ambiguous or uncertain language, both the circumstances surrounding the execution of a contract, *Bain v. Board of Trustees of Starke Memorial Hospital* (1990), Ind.App., 550 N.E.2d 106, 110, and the parties' conduct in connection with the contract may be considered. *Pierce v. Yochum* (1975), 164 Ind. App. 443, 451, 330 N.E.2d 102, 107. That is, a court will apply the construction which the parties have given to an ambiguous contract. *Oxford Development Corp. v. Rausauer Builders, Inc.* (1973), 158 Ind. App. 622, 628, 304 N.E.2d 211, 215. For example, a court interpreting an antenuptial agreement to determine the intent of the parties to it should consider "the language of the entire instrument, together with its general scope and purpose, the conditions surrounding the parties at the time the agreement was made, [and] the

legal rights of the parties as they existed before, and would have existed after the marriage if no agreement had been made." *Baugher v. Barrett* (1957), 128 Ind.App. 233, 239, 145 N.E.2d 297, 300, *trans. denied.* See also *Beatty v. Beatty* (1990), Ind.App., 555 N.E.2d 184, 187–88 and *Russell v. Walz* (1984), Ind.App., 458 N.E.2d 1172, 1180, *trans. denied* (both quoting *Baugher*).

■■■■ Because the antenuptial agreement was entitled Marital Property Agreement even though it did not refer to disposition of property, the trial court reasonably could have considered the agreement's intent to be ambiguous so that extrinsic, parol evidence of the parties' intent was necessary to interpret the agreement. Furthermore, *Baugher, Beatty,* and *Russell* indicate the court should have considered the conditions surrounding Jon and Christel at the time they made their agreement and their legal rights as they existed before and would have existed after the marriage had they made no agreement. Thus, we find no error in the trial court's admission of parol evidence of the conditions surrounding the parties at the time they executed the antenuptial agreement, including their intent in executing the agreement.

■■■■ However, we agree with Jon that the trial court erred in admitting parol evidence of the parties' conduct during marriage on the theory that such evidence could shed light on the parties' intent at the time of execution. Although we may look to the parties' conduct during the course of the contract in order to determine their true intent, *Sharp v. Jones* (1986), Ind. App., 497 N.E.2d 593, 596, we are persuaded by Jon's argument that performance of the agreement did not take place during the marriage but could only take place upon divorce. Therefore, Findings of Fact 14 and 15, to the extent they refer to the parties' post-execution conduct to interpret the antenuptial agreement, and Conclusions of Law 31 and 32, interpreting the agreement based on the parties' conduct

during marriage, are clearly erroneous.[5] Nevertheless, the judgment is supported amply by the court's remaining findings and conclusions on this issue.

The court found that Jon thought he had been treated unfairly under the terms of his prior divorce, was concerned with protecting his inheritance, and did not wish to maintain Christel or her children from her prior marriage in the event of their divorce. *See* Finding of Fact 4. Record at 144. The court further concluded that the parties entered into the antenuptial agreement in order to protect Jon's inheritance and to limit his potential obligations for child support for Christel and her children from a prior marriage. *See* Conclusion of Law 27. Record at 154. Our review does not indicate either the finding or the conclusion is unsupported by evidence or is clearly erroneous.

As discussed above, based on its construction of the agreement, the court determined in Conclusion of Law 3 that the antenuptial agreement had little to do with marital property even though the agreement was entitled Marital Property Agreement, and the court determined in Conclusion of Law 26 that the agreement, by its terms, dealt with child and spousal support rather than property division. Nevertheless, having admitted parol evidence from the parties regarding the circumstances at the time of execution of the agreement, the court concluded that because Christel had testified that one of the purposes of the antenuptial agreement was to protect Jon's $250,000 inheritance, the court in its distribution of marital assets would protect the value of that estate but not the specific assets contained within it. *See* Conclusions of Law 21, 27, 28, and 29. We do not find these conclusions to be clearly erroneous or unsupported by the evidence of record.

Finally, we find the court's Conclusion of Law 30, that given the value of the property currently held by the parties and the fact that Christel's two children from her prior marriage were emancipated, the re-

quirement that Jon supply to Christel a $45,000 house upon divorce was moot, was not a clearly erroneous conclusion.

*Issue Two*

Jon argues the court abused its discretion and erred as a matter of law in awarding Christel post-dissolution control of EVS and in ordering Jon to sell his 80% interest to her for 50% of the company's value. Jon asserts that he gave 20% of the EVS shares to Christel during their marriage, but he provided the capital and critical entrepreneurial ideas for EVS and, as its only president and chief executive officer, he led the enterprise in fifteen years from start-up to a valuable asset. Jon states he was unwilling to sell his EVS shares to Christel upon divorce and argues that the factors relied on by the court to shift control of EVS away from him are improper considerations under the property disposition section of the marital dissolution statute, IND. CODE § 31–1–11.5–11. The court had no statutory authority to consider the parties' individual efforts in building EVS, their management abilities, or Jon's health when the court awarded Christel the EVS stock and control of EVS, Jon urges. Jon also asserts that the factors relied on by the court are contrary to the evidence.

Christel contends the court properly exercised its discretion under I.C. § 31–1–11.5–11 in equally dividing the parties' property by awarding the EVS stock to her and ordering her to pay Jon for the stock.

 "The term 'property' means all the assets of either party or both parties, …" I.C. § 31–1–11.5–2(d). A trial court must "divide the property of the parties, whether owned by either spouse prior to the marriage, acquired by either spouse in his or her own right after the marriage … or acquired by their joint efforts, in a just and reasonable manner, …" I.C. § 31–1–11.5–11(b). Regardless of their source, all assets go into the marital pot

---

**5.** Because we do not address the court's theories that Jon's inheritance became dissociated from the marital estate or that the agreement was unconscionable, we do not consider Findings of Fact 14 and 15, or Conclusions of Law 31 and 32 from the point of view of support for those theories. Those findings and conclusions refer to the parties co-ownership of EVS.

for division. *McBride v. McBride* (1981), Ind.App., 427 N.E.2d 1148, 1151. At the time Jon filed for dissolution of marriage on February 23, 1987, I.C. § 31–1–11.5–11 required a trial court to determine what would be a just and reasonable property division.[6] In dividing the marital property in a just and reasonable manner, the court may divide the property in kind, award the property or parts of it to one party, require either spouse to pay the other for property, order a sale of property, or order a distribution of benefits payable after dissolution. I.C. § 31–1–11.5–11(b).

▪▪▪▪ We must determine whether, considering the factors in I.C. § 31–1–11.5–11(b) [now I.C. § 31–1–11.5–11(c) ], the trial court's disposition of the marital assets is clearly against the logic and effect of the facts and circumstances before the court. *Planert v. Planert* (1985), Ind.App., 478 N.E.2d 1251, 1252. Those factors include: (1) the contribution of each spouse to property acquisition; (2) the extent to which the property was acquired by each spouse prior to the marriage through gift or inheritance; (3) the economic circumstances of each spouse at the time of property disposition; (4) each spouse's conduct in disposing of or dissipating property during the marriage; and (5) the earnings or earnings ability of each spouse as related to a final property division. I.C. § 31–1–11.5–11(c). The trial court has broad discretionary power in disposition of marital property. *Kaply v. Kaply* (1983), Ind.App., 453 N.E.2d 331, 333. The party challenging the trial court's property division must overcome a strong presumption that the court complied with the statute. *Porter v. Porter* (1988), Ind. App., 526 N.E.2d 219, 222, *trans. denied.* "The fact that the same circumstances would justify a different award does not permit us to substitute our judgment for that of the trial court." *McBride,* 427 N.E.2d at 1151–52.

▪▪▪ EVS, acquired by Jon and Christel during their marriage, was a marital asset to be distributed by the court. *See* I.C.

§ 31–1–11.5–11(b). The trial court had the authority to award EVS shares to Christel and cash to Jon. *See Id.* In addition, the court was bound to consider each party's contribution in money and effort to the property acquisition and each party's earning ability. *See* I.C. § 31–1–11.5–11(c)(1), (5). Therefore, the trial court did not err in considering Jon's and Christel's efforts to build and operate EVS and their plans, or lack of them, for EVS's future. Because the parties' management abilities and health impacted on their contributions to EVS in the past and could impact on their earning ability in the future, those factors were necessarily and appropriately considered by the court. We hold the trial court had the authority to distribute EVS as a marital asset and did not err in considering such factors as the parties' management abilities and health.

Jon contends the evidence does not support the findings, especially Finding of Fact 30 that Christel and Jon contributed equally to the success of EVS and each should have a 50% interest in EVS's value. He also attacks the court's award of control of EVS to Christel. He argues that the evidence indicates he made more than 50% of the contributions of capital, ideas, and executive functions and that Christel did not make equal contributions toward the company's success.

Considering the evidence which supports the court's findings, we find that in late 1973 and early 1974 Jon and three other individuals conceived the idea of a business of exchanging vacation resort time share interests in condominiums. Jon had previous experience in the sales, real estate, and vacation-related industries. The business was incorporated as Resort Condominiums International, Ltd. (RCI Virginia) in January 1974. Using part of his inheritance, Jon bought shares of stock and became a commissioned salesman for RCI Virginia. At the initial corporate organizational meeting in June 1974, Jon was elected to the board of directors and chosen president. In October 1974, Jon bought a large

---

**6.** Effective September 1, 1987, I.C. § 31–1–11.5–11(c) contains a rebuttable presumption that an equal division of property is proper.

number of shares from some of the other shareholders. In 1976, Jon shifted the corporate domicile of RCI from Virginia to Indiana, putting 80% of the shares in his name and 20% of the shares in Christel's name. In 1977, RCI Indiana purchased the remaining shares of RCI Virginia. EVS was incorporated as a holding company for RCI Indiana and other subsidiaries.

In the beginning, Jon and Christel were the company's only employees and each devoted 50 to 60 hours each week to the business. Jon had primary responsibility for marketing, which included signing up resorts to affiliate with the EVS system. Christel had primary responsibility for the operational and administrative functions, including secretarial, clerical, telephone, and accounting tasks. The business made its first profit in 1975 and began to grow rapidly.

Jon continued in his responsibilities for marketing efforts and developer relations and exercised primary responsibility for the financial/investment side of EVS. Christel moved into management capacities at EVS. Her involvement grew when Jon was unable to work for two months in 1979 because of a heart attack. Christel functioned as chief executive officer during that period and during subsequent periods when Jon was physically disabled. From the period of 1983 until 1987, Jon was hospitalized at least 36 times and he became preoccupied about his health. Christel became executive vice president of EVS, overseeing the Mexican, European, and South African operations, participating in conferences and serving on association boards and committees, and running the EVS exchange and the publication and related computer operations. After 1981, Jon did very little travelling because of health reasons.

Christel presented evidence to the court that Jon was a heavy user of prescription drugs and tranquilizers and was lethargic and often depressed after 1980. She also presented testimony from EVS employees that Jon was consumed with his health and stressed out. In addition, management consultants hired by EVS indicated Jon's leadership of the company was deficient and lacking in planning, control, and direction. Christel also presented evidence that she was better at handling the day-to-day operations of EVS than Jon was and that her management style was more focused than Jon's.

While Jon makes a persuasive case that the evidence could be viewed differently and that he could be awarded control of EVS, the evidence also strongly supports the court's findings. We are unable to state that the particular findings which Jon attacks, Findings of Fact 15–28, 29(M), and 30–32, are unsupported by evidence or are clearly erroneous. In addition, we do not find the court's Conclusion of Law 6, that "[t]he Court has considered all elements of Indiana Code 31–1–11.5–11(c)(1)–(5) in deciding a just and reasonable division of property[ ]", was clearly erroneous or contrary to law. We find no abuse of the court's discretion to make a just and reasonable division of the marital asset, EVS, in either the court's decision that the value of EVS should be divided equally or the court's decision that control of EVS be awarded to Christel.

*Issue Three*

Jon contends the court erred in its judgment of the tax consequences of the property division. Specifically, Jon complains the court erred in permitting Christel to deduct over $20,000,000 for taxes from her payment for Jon's 50% of the value of EVS.

Christel argues that Jon is estopped from challenging the trial court's ruling on tax consequences because he failed to present evidence on that issue at trial or in additional proceedings before the court after the court's judgment until October 20, 1989. Christel filed an objection on the morning of Jon's October 20, 1989, presentation of the tax consequences of the disposition of EVS shares, urging the court that Jon should be estopped from presenting such evidence. The court denied the written objection.

Ind.Trial Rule 52(B) permits a court which has tried a claim without a jury to open the judgment, take additional testimony, and amend findings or make new find-

ings if the judgment or findings are against the weight of the evidence or are contrary to the evidence. On September 7, 1989, the court ordered Jon to confer with his tax experts to determine his best after-tax position if he were to receive a one-time cash payment of $67,500,000 from Christel and then present his position to Christel and her tax experts. After the parties and their experts could not agree on the tax consequences, the court held a hearing on October 20, 1989, for the express purpose of determining the best tax position Jon could attain from a cash payment of $67,-500,000. *See* Conclusion of Law 3 of the November 16, 1989, order clarifying the prior judgment, Record at 492. The court was permitted by T.R. 52(B) to open the judgment for additional findings and testimony. We find no error in the court's denial of Christel's objection, and we do not find that Jon was estopped from arguing the tax consequences on October 20, 1989, or that he is estopped from arguing them on appeal.

■ A trial court is required by I.C. § 31-1-11.5-11.1 to consider the tax consequences of property disposition. In *Harlan v. Harlan* (1990), Ind., 560 N.E.2d 1246, our supreme court affirmed our holding in *Harlan v. Harlan* (1989), Ind.App., 544 N.E.2d 553, 555, "that the statute requires the trial court to consider only the direct or inherent and necessarily incurred tax consequences of the property disposition." *Harlan,* 560 N.E.2d at 1246.

■ Contrary to Christel's contention that the *Harlan* holding does not apply to the facts of this case, our holding was not narrow and confined to the circumstances of *Harlan,* but broadly stated that I.C. § 31-1-11.5-11.1 "specifically limits the trial court to consider only the tax consequences *'of the property disposition.'*" *Harlan,* 544 N.E.2d at 555 (emphasis in the original). Our supreme court's opinion, handed down on October 20, 1990, made no attempt to limit its affirmation of our holding to the facts of the case. *See Harlan,*

560 N.E.2d at 1246. *See also Qazi v. Qazi* (1989), Ind.App., 546 N.E.2d 866, *trans. denied.* Therefore, we reject Christel's contention that the *Harlan* holding does not apply to these facts.

Christel concedes that, according to 26 U.S.C. § 1041(a) [7] the marital transfer between her and Jon was not a taxable transfer. Nevertheless, she argues that the legislature's use in I.C. § 31-1-11.5-11.1 of the term "tax consequences" instead of the term "taxable events", implies the legislature meant courts to consider transactions having an impact or future impact on taxpayers even though they are not taxable events. Christel contends that, pursuant to 26 U.S.C. § 1041(a), she received Jon's low original basis when he transferred his stock to her. Therefore, her future sale of the EVS stock could result in income tax liability of over $20,000,000 on capital gains, Christel states. Thus, a tax consequence occurred even though a taxable event did not, she urges. Christel's potential tax liability upon a future disposition of EVS stock is remote and is not a direct consequence of the property disposition itself. In light of our supreme court's broad holding in *Harlan,* 560 N.E.2d at 1246, that only the immediate tax consequences of the property disposition may be considered, we reject Christel's interpretation of I.C. § 31-1-11.5-11.1. We hold the trial court abused its discretion in considering the future tax consequences which Christel might have upon disposition of the EVS stock.

Jon attacks the court's determination in Conclusion of Law 3 of the November 16, 1989, judgment which, in interpreting the phrase "approximately $46,500,000 (after tax)" used in the judgment of May 15, 1989, in Finding of Fact 32, Record at 205, and in item 10 of the Judgment, Record at 208, stated the court intended the award to Jon to reflect his best after-tax position if a one-time cash payment of $67,500,000 were made to Jon under a court-ordered corporate redemption or sale to an unrelated third party. Christel alleges a court-or-

---

7. 26 U.S.C. § 1041(a), a part of the Internal Revenue Code, provides: "No gain or loss shall be recognized on a transfer of property from an individual to (or in trust for the benefit of)—(1) a spouse, or (2) a former spouse but only if the transfer is incident to the divorce."

dered redemption of Jon's EVS shares would have resulted in tax consequences to Jon, and therefore, the court should have deducted such a potential tax from the amount of cash which she owes Jon.[8] Jon notes that the court did not order such a redemption or third party sale and, thus, no taxes were paid by either Jon or Christel as a result of such hypothetical events. We agree with Jon that the trial court erred in considering such hypothetical events and speculative taxes. The court is to "consider only the direct or inherent and necessarily incurred tax consequences 'of the property disposition.'" *Harlan*, 560 N.E.2d at 1246.

Jon also contends the court erred and abused its discretion in awarding immediate ownership and control of the stock to Christel on May 15, 1989, while ordering that Christel need not pay Jon for his shares until August 21, 1989. Jon relies on the court's Finding of Fact 30 in the May 15, 1989, judgment in which the court found Jon and Christel should each receive one-half the value of the EVS stock because each had contributed equally to EVS's success. Jon calculates that if the statutory interest rate of 10% on judgments were applied to the $47,384,195 which Christel paid him for his EVS stock, he would have earned over one million dollars during the 81 day period between May 15, 1989, and August 21, 1989. The court's failure to order payment of interest for that period caused Christel to receive more than Jon in the property disposition, and violated the court's expressed intention of providing each party one-half of EVS's value, Jon alleges.

 A trial court has discretion to decide whether to award interest when property disposition payments are deferred. *Caddo v. Caddo* (1984), Ind.App., 468 N.E.2d 593, 594; *Van Riper v. Keim* (1982), Ind.App., 437 N.E.2d 130, 131–32. "We will presume the court is aware of the time value of money and will take it into account in making its award." *Caddo*, 468

N.E.2d at 594. Therefore, we find this trial court did not abuse its discretion in failing to order Christel to pay interest on the deferred payments to Jon and we find there was no unequal division of property merely because of the delay between the stock transfer and cash payment to Jon.

Jon further argues that the court abused its discretion in refusing to allow him, subject to his appeal of the court's judgment on the antenuptial agreement, to retain EVS and pay Christel half its value with no deduction for taxes. Jon says little about why he believes the court abused its discretion on this issue, but he seems to believe that because Christel was unwilling to pay him half EVS's value, $67,500,000, tax-free, the court was bound to order that Jon retain EVS and pay Christel the same amount tax-free. We held in *Issue Two* that the court did not abuse its discretion in awarding control of EVS to Christel. Even if we were to agree that the trial court did not err in determining that consideration of tax consequences should result in Jon receiving only $47,384,195 from Christel, we would be unable to hold that the court erred in refusing Jon's offer to pay Christel one-half of EVS's value without deducting taxes. The court had discretion in determining what a just and reasonable disposition of the property should be and did not err in choosing Christel's proposal over Jon's.

*Issue Four*

Christel cross-appeals, contending the court erred in allowing Jon, during the pendency of his appeal, to receive interest, earnings, and appreciation from, and to pledge or encumber his interest in, the escrowed $47,384,195 judgment. She states that she is not arguing that Jon has waived his right to appeal but that he should not have received the benefits of the judgment during his appeal.

 Relying upon I.C. § 34–1–47–1(a), Christel contends the court's order improperly allows Jon the use and benefit of his judgment during the period of appeal so

---

**8.** Jon argues that a corporate redemption, apart from a divorce situation, would have resulted in taxes to Christel instead of to him. Because of our disposition of this issue we need not decide whether Jon or Christel is correct about placement of tax liability.

that he is placed in the same economic position whether he wins or loses his appeal. I.C. § 34–1–47–1(a) provides: "The party obtaining a judgment shall not take an appeal after receiving any money paid or collected thereon." Contrary to Christel's argument, the statute does not prohibit the use of or the benefit from a money judgment.

Furthermore, with the expressed purpose of preventing Jon from collecting on the judgment during the appeal, the court ordered Christel to pay the judgment into an escrow account. Thus, Jon has not received or collected the money judgment, and I.C. § 34–1–47–1(a) does not apply.

 As additional support for her contention that Jon should not receive the use and benefit of the money in escrow, Christel cites *Terry v. Terry* (1973), 158 Ind.App. 218, 301 N.E.2d 853 and *O'Connor v. O'Connor* (1969), 253 Ind. 295, 253 N.E.2d 250. *Terry* held that the acceptance of the benefits of a judgment bars the right to an appeal. The *O'Connor* court also noted that "acceptance of *financial* benefits accruing to a spouse from the granting of a divorce may in some cases estop that spouse from the prosecution of an appeal." *O'Connor*, 253 Ind. at 298, 253 N.E.2d at 251 (emphasis in original, citations omitted). Nevertheless, the *O'Connor* court held that:

"[T]o constitute an acceptance of the benefits of divorce so as to preclude an appeal, the benefits 'accepted' must be of such a nature as to clearly indicate an intention on the part of that spouse to be bound by the divorce decree.... [T]he facts and circumstances of each case must control in determining whether there is a positive acceptance of the financial benefits precluding appeal. Factors to be considered are the very nature of the 'benefit' and its relation to the parties of the divorce, the likelihood that such 'benefits' will be dissipated and the use to which such 'benefits' are put by the spouse to which they are awarded."

*Id.* at 299, 253 N.E.2d at 252. The court then held that a party's sale of a car awarded in the divorce decree was not an acceptance of benefits which could estop that party from appealing. *See also Loeb v. Loeb* (1973), 261 Ind. 193, 301 N.E.2d 349 and *Scheetz v. Scheetz* (1987), Ind.App., 509 N.E.2d 840 (both affirming *O'Connor*). As Christel notes, the *Scheetz* court held that an appeal is not barred merely because the party has accepted some of the benefits of the judgment. *Scheetz*, 509 N.E.2d at 848. Rather, there must be a clear intention on the creditor spouse's part to be bound by the dissolution decree. *Id.* at 847. If a spouse is not bound by the decree and loses an appeal, that spouse is required to restore the benefits accepted. *Id.* at 848.

Christel urges that Jon's right to interest on the entire judgment and his right to borrow against his interest in the escrow constitute a receipt and use of the entire judgment. We disagree with her, and we hold that Jon's right, during appeal, to receive interest, earnings, and appreciation from the escrowed judgment and to grant a security interest in it do not indicate Jon's intent to be bound by the court's judgment. We hold the trial court did not err in so ordering.

Christel's final argument is that a majority of states do not hold a judgment holder to be entitled to interest on a money judgment during the period of an unsuccessful appeal. She cites 45 Am.Jur.2d *Interest and Usury* § 107 (1969); 47 C.J.S. *Interest* § 67 (1982); and Annotation, *Running of Interest on Judgment where Both Parties Appeal*, 11 A.L.R.4th 1099 (1982) for support. All three references emphasize that the appeal must be unsuccessful in order for the rule to apply. Because we agree with Jon that he was not awarded sufficient cash for his shares of EVS stock, Jon's appeal was not unsuccessful. Therefore, the rule followed by other jurisdictions would not apply to the present case even if we were to adopt it.[9]

---

9. The three references also note that where a statute provides that all judgments bear interest, then the rule does not apply. In Indiana, I.C. § 24–4.6–1–101 provides that interest be paid on

In summary, we affirm the court's decision the antenuptial agreement did not protect EVS from disposition between the parties as marital property, the court's order that the parties receive an equal portion of EVS's value and control of EVS be awarded to Christel, the court's failure to order payment of interest on the judgment until its deposit into escrow, and the court's order that, during appeal, Jon receive interest, earnings, and appreciation from the escrowed judgment and be allowed to grant a security interest in the escrowed judgment. However, we reverse the court's order that Jon's $67,500,000 share of the marital estate should be reduced for taxes. We remand this case to the trial court with the instructions that: 1) it revise its judgment to show that Jon should receive the full $67,500,000 unreduced for taxes; 2) it order Christel to pay the difference between the $47,384,195 amount which she paid into escrow and $67,500,000; and 3) it order Christel to pay interest on the difference at the statutory rate from August 21, 1989, until the difference is paid.

Affirmed in part, reversed in part, and remanded with instructions.

CONOVER and GARRARD, JJ., concur.

money judgments from the date of the court's finding until satisfaction. Because it is unnecessary to the disposition of this case, we decline to consider whether Indiana would adopt the majority rule in the absence of such a statute.