BELL AUTO SALES, INC., Appellant–Defendant–Cross Claimant Below

v.

JET, INC., Appellee–Defendant–Cross Defendant Below.

No. 57A03–9210–CV–336.

Court of Appeals of Indiana, Third District.

June 30, 1993.

---

John S. Knight, Parrish & Knight, Fort Wayne, for appellant.

Angella M. Castille, Warrick, Weaver & Boyn, Elkhart, for appellee.

STATON, Judge.

Bell Auto Sales, Inc. ("Bell") appeals an adverse judgment on Bell's cross-claim against JET, Inc. ("JET") in an action arising from the sale of a vehicle. Bell presents two issues for our review:

I.  Whether the trial court erroneously determined that JET is not liable to Bell for signing an inaccurate odometer mileage statement because JET did not sell the subject vehicle to Bell.

II. Whether the trial court erroneously concluded that JET did not violate the provisions of 15 U.S.C. § 1988 by acting with intent to defraud Bell.

We affirm.

Harold MacDonald filed a complaint against Bell and JET, alleging violations of the Federal Odometer Act, 15 U.S.C. § 1988, in the sale of a 1984 Ford pickup truck. Bell filed a cross-claim against JET, also alleging violations of the Act. At the conclusion of a bench trial, Bell was found liable to MacDonald for signing a false odometer statement with intent to defraud MacDonald. JET was found not liable. Subsequently, Bell and MacDonald settled; Bell appeals the trial court decision with respect to its ruling that JET had no liability to Bell.

The facts of the underlying transaction are as follows. Thomas Bontreger, vice president of JET, purchased the subject vehicle from Woodland Park, Inc. on January 25, 1985. Woodland issued a title to JET which stated that the odometer reading was 24,000 miles. JET leased the truck to Jayco, Inc. for long distance towing of manufactured recreational vehicles. During January 1987, the diesel engine of the truck became inoperable.

On February 25, 1987, Bontreger and John Neat of Isuzu Diesel of Indiana met to discuss the truck. Bontreger indicated to Neat that the truck engine was "worn out." Record, p. 988. The parties agreed that the truck would be transported to the Isuzu repair facility; Neat would then decide whether to repair the truck or dispose of it. After the truck was examined by a mechanic, Neat contacted Bontreger and recommended against rebuilding the engine. On March 18, 1987, Isuzu invoiced JET in the amount of $4,425.00 for a new engine for another truck, crediting JET with a cash payment of $800.00 and with a trade in for the subject truck in the amount of $3,625.00.

Neat contacted dealer Charles Bell, owner of Bell Auto Sales. Charles and his son, Steven Bell, examined the truck at Isuzu. The Bells inquired as to whether the odometer mileage of 46,000 was correct. Neat indicated that he did not know the actual mileage of the truck. At trial, Neat testified that he indicated that the mileage had to be at least 100,000 miles over that shown on the odometer. Record, p. 1063. Bell purchased the truck for $4,250.00. Isuzu provided no title or odometer mileage statement to Bell at the time that payment was made.

A few days after taking possession of the truck, Steven Bell requested an odometer mileage statement from Neat. Neat refused to sign the odometer mileage statement proffered by Bell, and suggested that Bell contact JET.

Steven Bell contacted John Morse, the controller for JET. Morse indicated that the odometer reading accurately reflected the actual mileage on the truck because it had been used locally by a representative of the sales department. Steven Bell mailed an odometer mileage statement to Morse for signature; the statement reflected mileage of 46,370 miles.

Morse examined the truck's maintenance records and found a record dated December 17, 1986 which reflected mileage of 44,567 miles. Morse examined no other records but signed the odometer mileage statement and returned it to Steven Bell.

On April 6, 1987, MacDonald went to the sales lot of Bell where he viewed the truck. MacDonald testified that the windshield indicated "one owner, low mileage, 46,000." Record, pp. 453–54. MacDonald inquired of salesman Henry Mills as to whether the mileage was accurate; Mills responded that it was. Record, p. 456. MacDonald purchased the truck for $10,000.00. Bell gave MacDonald a certificate of title and an odometer mileage statement signed by Mills. JET was listed as the owner of the truck.

MacDonald subsequently suspected that the truck had greater mileage than that reflected on the odometer and contacted Bell representatives. He attempted, without success, to obtain a price adjustment.

On May 20, 1987, Morse issued a letter to Steven Bell providing in pertinent part:

"This letter is to advise you that I was mistaken about the odometer reading on the above mentioned pick-up. It is my understanding that the mileage should be 146,000 miles instead of 46,000 miles.

We purchased the truck used with an odometer reading of approximately 24,000 miles on 01–17–85. I was under the impression that this truck was driven locally by one of our salesmen and that the mileage reading of 46,000 was correct. I regret to inform you that I was mistaken and apologize for any inconvenience this may have caused you."

Record, p. 754.

MacDonald was not informed of the mileage discrepancy. He initiated an investigation through the Attorney General's Office and subsequently filed the instant claim against Bell and JET.

## I.

### *Liability to Bell*

Bell challenges the trial court's conclusion that JET sold the truck to Isuzu rather than to Bell and that Bell was therefore not JET's "transferee" pursuant to 15 U.S.C. § 1988.[1] Bell specifically alleges that Findings 6, 7, 11 and 14 are unsupported by the evidence and that Conclusions D, E, H and O are contrary to law. The challenged findings and conclusions provide as follows:

"6. Mr. Neat, upon examination of the vehicle, observed a third fuel tank, which had a 100 gallon capacity. The tank filled the front one-third of the truck bed, from the floor as high as the side of the truck bed, and ran the width of the truck. He also observed a heavy-duty equalizer frame hitch with an electrical hookup and a second hookup to attach a fifth wheel trailer. Mr. Neat testified that Mr. Bontreger told him that the vehicle had come from another company

and could well have over 100,000 miles on it. Mr. Neat described it as having the potential to be brought back up to a good truck. Mr. Neat decided he would sell a new engine to Jet and take the truck, plus cash, in payment.

7. Thereafter, the vehicle was transported on a trailer from Jet to Mr. Neat's place of business in Fort Wayne. On March 18, 1987, Isuzu invoiced Jet in the amount of $4,425.00 for a new engine, crediting Jet with a cash payment of $800.00 and with the trade-in of the truck in the amount of $3,625.00. (Defendants' Exhibit Number D) On the immediately preceding day, March 17, 1987, Jet had issued its check number 5271, payable to Isuzu, in the amount of $800.00, for the purchase of the engine and trading in truck number 180, which was Jet's identification of the truck. (Defendants' Exhibit Number C)

11. Jet, at the time of trading this truck to Isuzu, did not execute an odometer statement pertaining to this truck.

14. Mr. Neat's asking price for the truck was $5,250.00 and he ultimately sold it to Bell Auto for $4,250.00. In his testimony he said that, in running condition, the truck was worth over $10,000.00; in further testimony, he said it had a loan value of $12,500.00 with a high mileage deduction of $2,000.00. On March 13, 1987, Bell Auto purchased the vehicle from Isuzu and issued their check, number 20970, dated March 13, 1987, (Plaintiff's Exhibit Number 13). Isuzu issued their receipt on March 13, 1987. (Plaintiff's Exhibit Number 14) The receipt was signed by Kay Neat.

D. A review of the Findings of Fact, which are based upon the evidence presented during the trial of this cause, reveals that Jet sold the truck to Isuzu, through Mr. Neat, for the price of $3,625.00 credited for the truck and $800.00 cash. In exchange, Jet received

---

**1.** 15 U.S.C. § 1988(a) provides: Not later than 90 days after October 20, 1972, the Secretary shall prescribe rules requiring any transferor to give the following written disclosure to the transferee in connection with the transfer of ownership of a motor vehicle: (1) Disclosure of the cumulative mileage registered on the odom-

eter. (2) Disclosure that the actual mileage is unknown, if the odometer reading is known to the transferor to be different from the number of miles the vehicle has actually traveled. Such rules shall prescribe the manner in which information shall be disclosed under this section and in which such information shall be retained.

a new engine from Mr. Neat. The check, issued by Jet, in payment of the $800.00 cash was issued on March 17, 1987, and a receipt for the full purchase price of the engine was issued by Isuzu on March 18, 1987. The title for the truck, in Jet's name, was forwarded to Isuzu at that time, although the manner in which it was executed by Jet is not revealed in the record since the back of the title is not in the record. The front of the title is Plaintiffs' Exhibit Number 3. Jet, by Mr. Morse, at the request of Steven Bell, on March 19, 1987, signed the odometer statement that had been filled in by Steven Bell, including the mileage, which was the reading off of the odometer in the truck. Steven Bell, on behalf of Bell Auto, purchased the truck from Isuzu for $4,250.00 and issued a check in payment thereof on March 13, 1987, (Plaintiff's Exhibit Number 13) and received a receipt from Isuzu dated March 13, 1987 (Plaintiff's Exhibit Number 14). Bell Auto did not have the odometer statement from Jet when it purchased the truck since it had purchased the truck six (6) days before the odometer statement was signed. The odometer statement is Plaintiff's Exhibit Number 12 and contains the following words at the top: 'REGULATIONS REQUIRE YOU TO STATE THE ODOMETER MILEAGE UPON TRANSFER OF OWNERSHIP. AN INACCURATE OR UNTRUTHFUL STATEMENT MAY MAKE YOU LIABLE FOR DAMAGES TO YOUR TRANSFEREE, FOR ATTORNEY FEES, AND FOR CIVIL OR CRIMINAL PENALTIES. * * *'

E. That odometer statement warns Jet that it is required to state the odometer mileage, upon transfer, and if the statement is inaccurate or untruthful such a statement may make Jet liable for damages to "YOUR TRANSFEREE". The record reveals that Jet sold this truck to Isuzu. Jet did execute the odometer statement to Bell Auto, which was identified as the transferee on the odometer statement. Jet transferred to Bell Auto and Bell Auto transferred to the Plaintiff. Jet did not transfer to the Plaintiff. Therefore, the Plaintiff is not Jet's transferee. The title was jumped from Jet to Bell Auto. Jet did not sell to Bell Auto and Bell Auto was not, lawfully, Jet's transferee. Bell Auto knew that, since it bought the truck from Isuzu. There is no evidence that Mr. Morse, on behalf of Jet, intended to defraud anyone, Bell Auto or the Plaintiff. Jet did not deal with the Plaintiff through any of its agents. It is evident that Mr. Morse was negligent in not checking the maintenance records on this truck more carefully before signing the odometer statement. These maintenance records (Defendant's Exhibit Number E) show the last maintenance was on December 17, 1986, at which time the mileage was 44,567 miles. With the information on the odometer statement showing 46,370 miles and the last worksheet showing 44,567 miles in December of '86, and, without more examination, someone could presume that an additional 2,000 miles was put on between December of '86 and March of '87. However, if Mr. Morse would have looked deeper through those maintenance records he would have found, 16 maintenance sheets earlier, a maintenance record dated September 15, 1985, showing 98,381 miles on this truck which was purchased on January 7, 1985. Its title was issued with 24,000 miles showing thereon as of January 7, 1985. The first maintenance record in this truck's file, which is part of the same Exhibit, shows the truck's first maintenance was performed on January 9, 1985. At that time it had 24,321 miles on it. If Mr. Morse had carefully examined these records he would have discovered that the truck was driven 74,060 miles in the first nine (9) months of 1985. From September of '85 to December of '86, a period of 15 months, another 46,186 miles was put on the truck. On May 20, 1987, Jet, by Mr. Morse, sent a letter to Bell Auto advising of his error on the mileage. Mr. Morse, therefore, did notify Bell Auto of his error when he discovered it. He revealed that mistake to Bell Auto. When Jet's attorney, Kennard R. Weaver, answered the Odometer Roll-

Back Questionnaire for the Attorney General's Office in response to the Plaintiff's Complaint, Mr. Weaver reported that the odometer reading was "46,000 approximately; but odometer had turn (SIC) over." Jet did report accurately to the Attorney General's office in regard to the mileage. The Court concludes that there was negligence on the part of Mr. Morse, however, that negligence did not rise to the level of intent to defraud, nor was it gross negligence, nor was the odometer statement signed by Mr. Morse with reckless disregard for the truth. Jet had no dealings with the Plaintiff before he purchased the truck and the Plaintiff never saw Jet's odometer statement until this litigation. There is no evidence that Jet is liable to the Plaintiff.

H. Bell Auto's intent to defraud finds further support from the information they placed on the windshield. Bell Auto received the title, through Mr. Neat, from Jet. The title revealed that when Jet received this motor vehicle on January 7, 1985, it already had 24,000 miles on it. This indicated that there was a prior owner before Jet. Charles Bell, in his testimony, acknowledged that he realized that is what that mileage reading meant. However, the Plaintiff testified that Bell Auto placed on the windshield "One owner, low mileage, 46,xxx miles". Isaiah Smith, Jr., who accompanied the Plaintiff to pick up the truck, also testified that this information was written on the windshield. The Court recognizes that Bell Auto denies having placed that information on the windshield. However, this Court has already determined that the representatives of Bell Auto are not credible in their testimony. The Court therefore concludes that the testimony of the Plaintiff and Isaiah Smith, Jr. is accurate and that this information was on the windshield. Bell Auto knew that placing "one owner" on the windshield was not correct information. Also, Bell Auto bought the truck from Isuzu and knew Jet had it before Isuzu, with 24,000 miles when Jet purchased it. Therefore, Bell Auto knew that there were at least three prior owners. The

Court recognizes, however, that Bell Auto could assume that Isuzu did not put any miles on it considering the condition of the engine. The Court concludes that this is further evidence of Bell Auto's intent to defraud.

O. The Court concludes that the relationship between Bell Auto and Jet was not the relationship intended to be covered by 15 U.S.C., Sections 1988 and 1989. Jet did not sell this vehicle to Bell Auto. It can be argued that Jet was the transferor to Bell Auto, since the title was jumped over from Isuzu. One element set forth in the quote from *Aldridge v. Billips* [(W.D.Va.1987) 656 F.Supp. 975], supra, is missing. The case of *Jones v. Fenton Ford* [(D.C.Conn. 1977) 427 F.Supp. 1328], supra, sets out four elements, and they are quoted in *Aldridge v. Billips*, supra. The element of inducing a business arrangement between Jet and Bell Auto does not exist. Bell Auto bought the truck from Isuzu and, therefore, Bell Auto owned the truck before it received the odometer statement from Jet. Therefore, since Jet had no business relationship with Bell Auto, it has no liability to Bell Auto. The Court recognizes that the title was able to jump from Jet to Bell Auto because Jet left the buyer's name blank and sent the title to Isuzu, their buyer, who then furnished it to Bell Auto. While that may not have been appropriate conduct by Jet, that issue is not involved in this litigation."

Record, pp. 271–303.

■ When a party has requested specific findings of fact and conclusions of law under Ind. Trial Rule 52(A), the reviewing court cannot affirm the judgment on any legal basis; rather, this Court must determine whether the trial court's findings are sufficient to support the judgment. *Vanderburgh County Board of Commissioners v. Rittenhouse* (1991), Ind.App., 575 N.E.2d 663, 665, *trans. denied.* In reviewing the judgment, we must first determine whether the evidence supports the findings and second, whether the findings support the judgment. *Id.* The judgment will be

reversed only when clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and conclusions of law entered on the findings. *DeHaan v. DeHaan* (1991), Ind.App., 572 N.E.2d 1315, 1320, *reh. denied, trans. denied.* Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.* To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom, and we will not reweigh the evidence or assess witness credibility. *Id.*

Our review of the record of proceedings leads to the conclusion that the findings of the trial court have evidentiary support. We briefly summarize the evidence supporting the challenged findings:

Finding 6: John Neat testified that he examined the truck with clearly visible features of an extra fuel tank and a hitch and determined that it was "worth buying." Record, pp. 1049–50. He indicated that Bontreger represented that the truck had a broken engine with possibly over 100,000 miles of use. Bontreger and Neat negotiated a price for the truck (to be applied against the purchase of an engine). Record, pp. 1051–53.

Finding 7: Neat testified that Isuzu took possession of the truck when it was delivered on a trailer by JET's chief mechanic. Record, p. 1053. An invoice was issued from Isuzu to JET on March 18, 1987. JET was charged $4,425.00 for a QD–145T engine, and credited with a cash down payment of $800.00 and a truck trade in of $3,625.00. Record, p. 790. On March 17, 1987, JET issued a check to Isuzu in the amount of $800.00. Record, p. 697.

Finding 11: John Morse, controller for JET, testified that no odometer statement was provided to Isuzu at the time of sale. Record, p. 703.

Finding 14: Neat testified that he asked $5,250.00 for the truck and received $4,250.00 from Bell. Record, p. 1063. Neat also testified that the fair market value of the truck in running condition was over $10,000.00. Record, p. 1065. Bell executed a check to Isuzu in the amount of $4,250.00. Record, p. 635. In turn, Bell received a receipt for the purchase from Isuzu. Record, p. 641.

We further conclude that the challenged findings, together with the remaining (extensive) findings of the trial court, support the trial court's determination that JET sold the subject vehicle to Isuzu.

■ IND.CODE 26–1–2–106(1) provides that a "sale consists in the passing of title from the seller to the buyer for a price." IND.CODE 26–1–2–401(2) provides: "Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place ..."

The evidence adduced at trial (and reflected in the trial court's findings) discloses that JET transported the truck to Isuzu, received compensation from Isuzu for the truck and provided title to the truck to Isuzu on the date that a check for $800.00 was issued to Isuzu in response to Isuzu's invoice. The trial court's conclusion that JET sold the truck to Isuzu is not contrary to law.

## II.

### *Violation of 15 U.S.C. § 1988*

Next, Bell claims that the trial court should have found that JET violated the provisions of 15 U.S.C. § 1988 and awarded Bell damages pursuant to 15 U.S.C. § 1989.[2] The trial court concluded, in per-

2. Specifically, Bell challenges these additional conclusions of the trial court:

M. The Plaintiff's claim for damages is therefore limited to the provisions of 15 U.S.C., Section 1989, which is $1,500.00, and attorney's fees, from Bell Auto. The Court concludes that the Plaintiff is entitled to recover $1,500.00 and his attorney's fees, from Bell Auto, but that the Plaintiff is not entitled to recover from Jet.

P. Mr. Morse's conduct in responding to inquiries about why he prepared the odometer statement without investigating the records fur-

tinent part, that JET controller Morse was negligent in signing the odometer statement completed by Bell. However, the court also concluded that such negligence did not amount to gross negligence or a reckless disregard for the truth which would support liability under 15 U.S.C. § 1988.

■ Pursuant to 15 U.S.C. § 1988, sellers of motor vehicles are required to provide written disclosure to the buyer of the cumulative mileage registered on the odometer or state that the actual mileage is unknown. If in the exercise of reasonable care the seller should have known that the odometer has turned over, the transferor must disclose this fact to the purchaser. *Aldridge v. Billips* (W.D.Va.1987) 656 F.Supp. 975, 978. If the transferor has a reason to know by the exercise of reasonable care that the odometer has turned over and he does not inform the purchaser, the intent to defraud may be inferred from that violation of the Act. Moreover, acting with reckless disregard for the truth when executing an odometer statement may subject the transferor to liability. *Id.*[3]

Bell contends that Morse's intent to defraud may be inferred because Morse recklessly disregarded indications that the mileage was incorrect when signing the odome-

ter statement that provided that the truck had 46,378 miles. As cross-claimant, Bell had the burden of proof on this issue. Bell was unsuccessful at trial and now appeals a negative judgment.

■ When reviewing an appeal from a negative judgment we must determine whether the judgment is contrary to law. *McClure Oil Corp. v. Murray Equipment, Inc.* (1987), Ind.App., 515 N.E.2d 546, 553, *reh. denied.* A judgment is contrary to law when the evidence is without conflict and leads to but one conclusion which is contrary to that reached by the trial court. *Ashland Pipeline Co. v. Indiana Bell Telephone Co., Inc.* (1987), Ind.App., 505 N.E.2d 483, 489, *reh. denied, trans. denied.*

■ In the instant case, Morse obtained the mechanics' file on the truck before signing the odometer statement proffered by Steven Bell. The last repair order placed in the file indicated mileage of approximately 44,000 miles. Record, p. 717. Relying upon the information contained in the single repair order, Morse signed the odometer statement. Additionally, Morse inquired of a mechanic whether the miles shown on a repair order corresponded to actual miles on the odometer and received a

---

ther, why he wrote the letter of May 20, 1987, when he has no recollection of what prompted him to do that, or how he acquired the information that the mileage was 100,000 miles short, and his conduct in executing affidavits during the course of this litigation, which gave various explanations that were inconsistent with each other all raise questions. However, the Court has examined this case from the standpoint of the existence of an intent to defraud at the time the odometer statement was prepared. The Court has also examined the case from the standpoint of what people did when it was brought to their attention that the odometer statement that was given by Bell Auto was being challenged. Jet, through Mr. Morse, sent a letter putting Bell Auto on notice of the error. Jet responded to the Attorney General honestly. Mr. Morse's inconsistent explanations on how he acquired this additional information, this Court concludes, do not go to intent to defraud, but to attempts to explain negligent conduct in signing an affidavit with incorrect information. A complete review of all of Mr. Morse's conduct, and the conduct of Mr. Bontreger when he learned about the affidavit, does not rise to a

level of fraud or evidence of intent to defraud. Jet acknowledged the mistake from the beginning, and the big issue in this case, concerning Jet, became how they made the mistake. There was no evidence that the mistake was made with any fraudulent intent. It appears Mr. Morse was, at most, negligent in preparing the affidavit and negligent in his recall on how he learned of his mistake. He continued to be negligent by executing affidavits without being certain of whether his recall was correct or not. Record, pp. 302–304.

**3.** Civil liability may be imposed where it is proved that a defendant's statements were made recklessly or carelessly or without reasonable grounds for belief in their truth, especially where (1) the defendant was under a duty to have the knowledge in question (2) a relation of trust or expert reliance existed (3) a statement was made to induce a business arrangement or (4) the knowledge or information in question was within the special province of the defendant. If these conditions are met, it does not matter whether or not the declarant actually believed the statement in question to be true. *Id.*

reply in the affirmative. Record, p. 762. Arguably, Morse could have conducted a more diligent and thorough search of the mechanics' records and would have discovered records indicating that the truck had traveled over 100,000 miles. However, we cannot conclude that the evidence of his intent to defraud is without conflict and leads to a single conclusion which is opposite that reached by the trial court.

The judgment of the trial court is affirmed.

HOFFMAN and NAJAM, JJ., concur.