**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 10 2014, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**RICHARD RANUCCI**
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**THOMAS M. GREEN**
Law Office of Thomas M. Green
Carmel, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE MARRIAGE OF                          )
JAMES BARNUM GREGORY,                           )
                                               )
    Appellant-Respondent,                      )
                                               )
        vs.                               )    No. 49A05-1305-DR-205
                                               )
ELLEN DAVIES GREGORY,                           )
                                               )
    Appellee-Petitioner.                       )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Deborah J. Shook, Master Commissioner
Cause No. 49D04-1103-DR-9645

**January 10, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BRADFORD, Judge**

## CASE SUMMARY

Appellant-Respondent James Barnum Gregory ("Husband") and Appellee-Petitioner Ellen Davies Gregory ("Wife") were married in 1989 and had children in 1995 and 1999. Husband is an executive in marketing at Eli Lilly, and Wife is an attorney who works part time due to health problems. When the parties married, Wife possessed a substantial amount of family money that has been in an investment account ever since, an account to which Husband never contributed or had access. As the years passed, Husband came to make substantially more money than Wife, which was a result of career choices that favored Husband's career over Wife's, Wife's choice to spend significant amounts of time raising the children, and her health problems. In recent years, Husband's income has been approximately three to four times Wife's. The parties' children attend Park Tudor, a private school in Indianapolis, and both parties desire that they continue to do so. Over the years, the children have acquired several investment accounts in each of their names, accounts which were, for the most part funded by gifts from Wife's mother and are now worth in excess of $400,000.

In March of 2011, Wife filed a dissolution petition. Once the dust settled, the trial court ordered, *inter alia*, that the marital estate be divided 60%/40% in favor of Wife, that Husband pay $291 per week in child support, that the accounts held by the children were not part of the marital estate, and that Husband would be obligated to pay 78% of the cost for the children to continue at Park Tudor. Husband contends on appeal that the trial court abused its discretion in awarding sixty percent of the marital estate to Wife, abused its discretion in calculating Husband's child support obligations, erred in not including

2

certain investment accounts held by the couple's children in the marital estate, and improperly calculated the parties' obligations for the children's private education. While we affirm the vast majority of the trial court's challenged rulings, we remand for recalculation of Husband's child support obligation and education obligation. We affirm in part, reverse in part, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

Husband graduated from Harvard University with a B.A. in economics, while Wife graduated with a B.A. from Princeton before earning her law degree from UCLA in 1989. Husband and Wife were married in August of 1989 and soon relocated to Chicago so that Husband could pursue his MBA at the University of Chicago. While Husband was in school, Wife worked full time as an attorney. After Husband graduated in 1992, he began working for Eli Lilly in Chicago, and the couple relocated to Indianapolis in 1994 to advance Husband's career. Husband still works at Eli Lilly as a Director of Marketing. Husband and Wife have two children, C.G., born in 1995, and A.G., born in 1999 (collectively, "the Children").

*Wife*

At the time of the marriage, Wife held family gifts totaling $303,464.53. In 2002, Wife received a gift/bequest of $18,042.50 from her family. Wife used the funds mentioned above to establish an investment account with the State Street Bank ("the State Street Account"), an account to which Husband has never had access or made any direct contributions. The trial court made the following findings regarding the State Street Account:

221. The value of the State Street Account on November 11, 2011, was $1,093,912.25.

222. Husband has never had access to this account, or the ability to access this account, or the funds in the account under any name, or held with any prior financial institution. The account, and the funds in the account, have always been in Wife's name.

223. The State Street Account was never treated as marital property. Husband did not contribute to the acquisition or accumulation of those funds.

224. The funds in the State Street Account can be traced directly to the $303,463.53 which Wife entered the marriage with, and the $18,042.50 which she received in 2002 as a gift/bequest from her family.

225. The $303,463.53 originated from an interest Wife had in an investment partnership established by her father when he was diagnosed with kidney disease. The partnership was call "TALE," which stood for "Tom, Anne, Lynn and Ellen," Wife and her siblings. When the partnership dissolved, [Wife's] share of the money was distributed to [Wife]. The money from [Wife's] distribution remains invested in a group of accounts held by Wife and her siblings, managed by Redwood Investments.

226. Husband never deposited any funds into the State Street Account.

227. Except for the instance regarding $15,000 being replaced into the State Street Account from the joint checking account directly before Wife filed the Petition for Dissolution of Marriage, funds in State Street have never been co-mingled with any other assets of the marital estate.

228. Husband never requested access to the State Street Account.

229. Wife was the only party responsible for preserving the value of the State Street Account during the marriage.

230. During the marriage, Wife made withdrawals from the State Street Account. Many of these withdrawals were to pay income taxes. "Periodically" Wife withdrew from the account when the parties were unable to pay bills. There was not a pattern to the withdrawals. Wife made larger withdrawals to purchase assets which remain as part of the marital estate. These include a transfer of $70,000 to pay the down payment and for furnishings for the parties' first house in 2002; $40,000 for a new BMW for Husband in 2002; $30,000 for Wife's Ford Escape; $50,000 for one of the condominiums in 2008; $50,798 for one of the condominiums in 2009; and $160,000 in 2010 to purchase the condominium that Wife moved into upon separation.

231. Wife's withdrawals from the State Street Account during the marriage allowed the parties to use their employment income in other areas. For example, Husband contributed the maximum into his Eli Lilly 401(k) Account.

4

Appellant's App. pp. 53-55.

Wife worked full time as an attorney in Chicago from 1989 until 1994, when the couple relocated to Indianapolis. In 1993, Wife's last year of full time employment, she earned $88,644.00. Wife became pregnant with C.G. soon after relocating and ultimately did not work from 1994 until 1997 so that she could care for C.G. In 1997, Wife took a part time position with the Indianapolis law firm Ice Miller, employment she held until 2009 with the exception of an eighteen-month break following A.G.'s birth in 1999. Wife currently works as a solo practitioner whose practice depends entirely on her only client, the East Chicago Waterway Management District. Wife's income from 1997 to 2009 is summarized below:

| 1997 | $37,575 |
| 1998 | $47,275 |
| 1999 | $19,287 |
| 2000 | $3887 |
| 2001 | $50,131 |
| 2002 | $47,173 |
| 2003 | $28,827 |
| 2004 | $41,905 |
| 2005 | $26,922 |
| 2006 | $31,103 |
| 2007 | $31,718 |
| 2008 | $42,381 |
| 2009 | $77,972 |
| 2010 | $52,836 |

Appellant's App. p. 19, Petitioner's Ex. 2.

In addition to Wife's law practice, she operates a rental property business, EDG Properties LLC, which rents condominiums purchased by Wife with funds from the State Street Account. In 2011, EDG's expenses exceeded income for a net loss of $10,157.23.

5

Wife's net profit from her law practice and EDG for 2011 was $70,190.35. In addition, Wife receives a yearly gift from her mother of approximately $13,000.00 and has for approximately twelve years. During the parties' marriage, Wife traditionally deposited these gifts from mother into the parties' joint checking account to be used for marriage expenses.

In 2003, Wife contracted influenza, which ultimately led to pneumonia and pleurisy, the latter of which she suffered from until 2004. Even after recovering from pleurisy, Wife continued to experience fatigue and very serious pain, primarily in her neck and upper back. At times, Wife experiences flare-ups during which the pain is more severe and affects more of her body. Wife continues to experience these symptoms, has sought treatment for them since 2004, and can work only three to four hours a day. Wife schedules all of her work-related appointments in the afternoon and may be confined to bed, unable to work, for a week in the event of a flare-up. Wife is currently taking Lexapro for depression; Lipitor for high cholesterol; Seroquil for depression and sleeping; Ambien for insomnia; Avian for painful menstruation; Valtrex; Provigil to assist concentration; Lyrica for pain; Colace, Pericolace, and Febrecon for constipation; Z-BEC for brittle fingernails and hair; Claritin for allergies; Tylenol for pain; and an ocular vitamin for a degenerative ocular condition. The uninsured cost of Wife's medication is approximately $2250.00 per month.

Michael Blankenship testified on behalf of Wife during the hearings on the dissolution. Blankenship reviewed Wife's medical, psychological, and work histories and determined that, while Wife had the ability to work, she was currently working at her

6

maximum, albeit reduced, capacity. Blankenship filed a report with the trial court and made the following observations:

> Regarding the issue of Employability, [Wife] may be confronted with grave difficulties with respect to scheduling, productivity, or availability at the time a specific service or activity is necessitated. Given that perspective, her current employment arrangement allows that latitude and the variability essential to be compatible with her medical and psychological impairments. To expect her to expand or increase her practice is vocationally beyond the level of her functional capacity.
> Based on the demonstrated earning record reported to the Social Security Administration, [Wife] has demonstrated continuity but not consistency. It appears that her income is directly related to her capacity to provide service to her one client. Should that dwindle or become non-existent, it is questionable that [Wife] would be able to secure another client who has similar needs and would allow a similar degree of flexibility.
> [Wife] has a medical condition which has become progressively debilitating. In the event that she is incapable of improvement, and there is no cure for fibromyalgia,[1] she will become evermore less likely to position herself in the competitive market place. She has, therefore, become materially affected with regard to her ability to support herself.

Appellant's App. p. 20.

*Husband*

After earning his MBA, Husband began working for Eli Lilly in Chicago in 1992. In 1993, Husband earned $55,524.00. In 1994, Husband and Wife relocated to Indianapolis so that Husband could accept a promotion at Eli Lilly, where he still works as a Director of Marketing. The following table summarizes Husband's total salaries for the years 1994 to 2010:

| 1994 | $83,981 |
| 1995 | $66,936 |
| 1996 | $72,833 |
| 1997 | $104,873 |

[1] The trial court noted that there has been no formal diagnosis of fibromyalgia.

| 1998 | $96,670 |
| 1999 | $197,722 |
| 2000 | $158,155 |
| 2001 | $160,398 |
| 2002 | $141,585 |
| 2003 | $132,740 |
| 2004 | $144,808 |
| 2005 | $164,633 |
| 2006 | $227,330 |
| 2007 | $229,166 |
| 2008 | $235,296 |
| 2009 | $222,072 |
| 2010 | $227,457 |

Appellant's App. p. 24.

Husband has traditionally received bonus income in addition to his regular salary, which bonus income is paid in March of the year following the one in which it was earned. Husband earned $252,051.93 in 2011, of which $169,339.88 was regular income, $44,659.85 was Corporate Bonus Plan income earned for 2010, and the balance was additional incentive income. In March of 2012, Husband received Corporate Bonus Plan income of $50,272.69 and an additional performance award of $19,128.40. Husband is able to work at his full capacity and received a bonus each of the five years preceding his separation from wife. Husband also received yearly gifts from Wife's mother during the parties' marriage, which gifts, beginning in 2004, he deposited into a checking account in his name.

*The Children*

At the time of the hearing in this case, both Children attended Park Tudor Schools; C.G. was a sophomore and A.G. was in the sixth grade. Park Tudor tuition is over $18,000 per year per child. Both parents wish for the Children to continue to attend Park

Tudor and continue on to post-secondary education. In 2004, Wife opened two 529 accounts, Fidelity Education Account 3849 ("Account 3849") for C.G. and Fidelity Education Account 3830 ("Account 3830") for A.G. As of January 11, 2013, Account 3849 had a value of $38,916.47, and Account 3830 had a value of $26,034.07. In 2009, Husband opened two Schwab 529 accounts, one for each child, and each valued at $2609.59 as of January 11, 2013. The 529 accounts are intended to fund the Children's post-secondary education.

In addition, both Children hold several investment accounts, including certificates of deposit ("CDs") and accounts opened pursuant to the Uniform Transfer to Minors Act ("UTMA") (collectively, "the Children's Accounts"). The Children's Accounts have been funded solely by gifts from Wife's mother, were not intended to be used to defray the costs of raising or educating the Children, and have never been transferred to Husband or Wife.

*Procedural History*

On March 11, 2011, Wife filed a dissolution petition. After several evidentiary hearings and submission by both parties of proposed findings of fact and conclusions of law, the trial court issued its dissolution decree on January 11, 2013. The trial court found the marital estate to be worth a net of $3,346,246.28. The trial court included the State Street Account in the marital estate but did not include the Children's Accounts.

The dissolution decree also provided, in relevant part, as follows:

(D)     Husband shall pay child support to Wife in the amount of Three Hundred Seventeen ($317.00) per week, to commence the Friday following the date this Decree is entered.

9

....

(G)     The parties shall continue to pay the tuition costs attendant to Park Tudor for both minor children. These expenses shall be paid in the same manner as Ordered in the Provisional Stipulations and Provisional Orders, except that Husband shall pay 78% and Wife shall pay 22%.

....

(L)     The "Children's Accounts" as defined above are excluded from the marital estate. Wife shall remain sole custodian on all such Accounts.

(M)     The allocation of the marital estate shall occur as provided above. Wife shall receive 60% of the marital estate, and Husband shall receive 40%.

Appellant's App. pp. 63-64.

On January 30, 2013, the trial court issued an order amending, *nunc pro tunc*, the original decree. On April 8, 2013, the trial court issued its order on Husband's motion to correct error, which provided, in relevant part, as follows:

> 1. The Court has included $264.00 per week in [Wife's] income which represents the calculation of her annual investment income
> 2. For child support purposes, [Wife's] weekly gross income is recalculated at $1,622.00 per week, which results in [Husband's] child support obligation of $291.00 per week[.]

Appellant's App. p. 70.

**DISCUSSION AND DECISION**

When we review a case in which the trial court has made requested findings of fact and conclusions of law, we will not set aside the court's judgment unless it is clearly erroneous. *Rose Acre Farms, Inc. v. Greemann Real Estate* (1987), Ind. App., 516 N.E.2d 1095, 1097, *trans. denied*. A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. Findings of fact are clearly erroneous when the record lacks any facts or reasonable inferences to support them. *Donavan v. Ivy Knoll Apartments Partnership* (1989), Ind. App., 537 N.E.2d 47, 50. In determining whether the findings and judgment are clearly erroneous, we will neither reweigh the evidence nor judge witness credibility, but we will consider only the evidence and reasonable

10

inferences therefrom which support the judgment. *Agrarian Grain Co. v. Meeker* (1988), Ind. App., 526 N.E.2d 1189, 1191. A judgment is contrary to law if it is contrary to the trial court's special findings. *Id.*

*DeHaan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind. Ct. App. 1991), *trans. denied*.

## I. Division of Personal Property in Marital Estate

Husband contends that the trial court abused its discretion in awarding Wife 60% of the marital estate. "Subject to the statutory presumption that an equal distribution of marital property is just and reasonable, the disposition of marital assets is committed to the sound discretion of the trial court." *Augspurger v. Hudson*, 802 N.E.2d 503, 512 (Ind. Ct. App. 2004).

> An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances, or the reasonable, probable, and actual deductions to be drawn therefrom. An abuse of discretion also occurs when the trial court misinterprets the law or disregards evidence of factors listed in the controlling statute. The presumption that a dissolution court correctly followed the law and made all the proper considerations in crafting its property distribution is one of the strongest presumptions applicable to our consideration on appeal. Thus, we will reverse a property distribution only if there is no rational basis for the award and, although the circumstances may have justified a different property distribution, we may not substitute our judgment for that of the dissolution court.

*Id*. (citations, quotation marks, and brackets omitted).

> Indiana Code section 31-15-7-5 provides that
>
> The court shall presume that an equal division of the marital property between the parties is just and reasonable. However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
>     (1) The contribution of each spouse to the acquisition of the property, regardless of whether the contribution was income producing.
>     (2) The extent to which the property was acquired by each spouse:

11

(A) before the marriage; or

(B) through inheritance or gift.

(3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

(A) a final division of property; and

(B) a final determination of the property rights of the parties.

The trial court made the following findings regarding the division of the marital estate:

259. The current case has circumstances which justify a deviation from the presumptive 50/50 split, including the following factors: Husband has far greater earning capacity than Wife; Wife entered the marriage with $303,463.53 in assets; Wife received an additional inheritance during the marriage in the amount of $18,042.50; the parties benefited from significant annual gifts from Wife's mother; Wife contributed to the acquisition of property through her monetary contributions and through her homemaking; the parties moved two times during the marriage to foster Husband's career; Wife paid for Husband's M.B.A. and paid the expenses of the marriage while he was in school; and the parties' respective financial circumstances, in that Wife's ongoing health problems will cause greater future medical expenses and lower earning capacity.

260. The Court finds that a deviation in Wife's favor is appropriate, with Wife receiving sixty percent (60%) of the marital estate and Husband receiving forty percent (40%).

Appellant's App. p. 62. Husband contends that the trial court abused its discretion in awarding Wife 60% of the marital estate, making several specific contentions.

## A. Wife's and Husband's Non-Income Producing Contributions

Husband's first argument is premised on the trial court's findings regarding the State Street Account, which, taken as a whole, indicate that the trial court considered

12

Wife responsible for its current value. Specifically, Husband challenges the findings that he did not contribute to the acquisition or accumulation of funds in the State Street Account, Wife was the only party responsible for preserving its value, and the entirety of its value is directly attributable to assets owned by Wife at the date of marriage.

Under the circumstances of this case, we cannot say that the trial court abused its discretion in this regard. While we acknowledge that Husband earned far more than Wife over the course of their marriage, this seems to have been in large part due to choices made by Wife, and supported by Husband, which directly contributed to Husband's career advancement. Wife paid for Husband's MBA and supported the family while he earned it, relocated to Indianapolis (leaving a lucrative legal position) so that Husband could accept a promotion, and took significant amounts of time away from work to raise A.G. and C.G. So, while Husband may be correct that the parties may have had to tap into the State Street Account had it not been for his higher income, that income is largely the result of Wife's non-income-producing contributions to the marriage. Husband's claim that his own non-income-producing contributions were not given sufficient weight by the trial court is an invitation to reweigh the evidence, which we will not do.

### B. Gifts to Each Spouse from Wife's Mother

Husband notes that Wife's mother gave each party annual gift checks in equal amounts of $10,000 to $13,000 from at least as far back as 2000 until 2010. Husband notes that his gift checks were deposited in accounts that were ultimately included in the marital estate and argues that the trial court improperly failed to sufficiently credit Husband with these contributions to the marital estate because the gifts originated with

13

Wife's relative.  Wife's gifts from her mother, however, were also included in the marital estate, as she deposited hers into the parties' joint checking account.  Indeed, the record indicates that while Wife traditionally deposited her gifts into the parties' joint checking account, whose funds were used on marriage expenses, Husband, after 2004, deposited his gifts into a separate checking account in his name only.  Put another way, Husband seems likely to have benefited more from the gifts during the marriage than Wife, which reasonably supports an unequal division of the marital estate.

## C.  Treatment of Investment Growth of State Street Account as a Gift to Wife

Husband contends that the trial court should have attributed the post-marriage growth in the State Street Account to him as much as to Wife.  As the trial court found and Husband does not dispute, however, the State Street Account was funded solely by Wife with Husband never depositing any funds into it whatsoever.  Husband cites *Wortkoetter v. Wortkoetter*, 971 N.E.2d 685, 689 (Ind. Ct. App. 2012), for the position that appreciation of a gift to one spouse over the course of a marriage is a divisible marital asset.  *Wortkoetter*, however, does not help Husband, as the appreciation *was* included in the marital estate here, although the estate was not divided as Husband would have liked.  Again, Husband seems to be arguing that his non-income-producing contributions to the marital estate have been undervalued, which is an invitation to reweigh the evidence, one that we decline.

## D.  Conclusion that State Street Account Was Never Considered Part of Marital Estate

14

In this argument, Husband seems to be suggesting that the trial court improperly excluded the State Street Account from the marital estate and based its 60/40 division on that erroneous conclusion. As previously mentioned, however, the State Street Account was, in fact, specifically included in the marital estate. Husband has failed to establish an abuse of discretion in this regard.

### E. Conclusion that Wife's Health Would Lead to Greater Expenses and Lower Income

Husband argues that the trial court erroneously concluded that Wife's future health care expenses would be greater and that her future earnings would be less. Husband's argument seems to be premised on his contention that the trial court was comparing Wife's anticipated expenses and income to her present expenses and income. In context, however, it is clear that the trial court was comparing Wife's anticipated expenses and income to Husband's. There is ample evidence in the record to establish that Wife's future healthcare expenses will be greater than Husband's and that her income will be lower. Wife suffers from, among other things, debilitating pain and fatigue and is only able to work three to four hours per day, and the monthly pre-insurance cost of her many medications is approximately $2250.00. Wife testified that she foresaw ongoing health problems and requested that the State Street Account be available to her for medical expenses. Husband, on the other hand, points to no evidence that Wife's health problems will ever improve or that he is currently suffering from any health difficulty.

The record also contains ample evidence that Husband has far greater future earning potential than Wife. Below is a table that partially summarizes the parties' incomes over the years:

|      | Wife     | Husband   |
| ---- | -------- | --------- |
| 1994 |          | $83,981   |
| 1995 |          | $66,936   |
| 1996 |          | $72,833   |
| 1997 | $37,575  | $104,873  |
| 1998 | $47,275  | $96,670   |
| 1999 | $19,287  | $197,722  |
| 2000 | $3887    | $158,155  |
| 2001 | $50,131  | $160,398  |
| 2002 | $47,173  | $141,585  |
| 2003 | $28,827  | $132,740  |
| 2004 | $41,905  | $144,808  |
| 2005 | $26,922  | $164,633  |
| 2006 | $31,103  | $227,330  |
| 2007 | $31,718  | $229,166  |
| 2008 | $42,381  | $235,296  |
| 2009 | $77,972  | $222,072  |
| 2010 | $52,836  | $227,457  |
| 2011 | $70,190  | $252,052  |

If past performance is any indication, Husband will continue to earn far more than Wife in the future. Husband gives us no reason to believe that he will earn substantially less in the future or that Wife, who suffers from heath conditions that prevent her from working to full capacity, will earn substantially more. Even in 2011, most of which passed after the parties' separation and when Wife presumably would have had more incentive to maximize her earnings, her net profit from her law practice and EDG was $70,190.35. The trial court did not abuse its discretion in anticipating that Wife's health expenses would exceed Husband's and that his income would exceed hers. The trial court did not abuse its discretion in dividing the marital estate.

16

## II. Child Support

Husband contends that the trial court abused its discretion in calculating his child support obligation. For purposes of calculating Husband's child support obligation, the trial court made the following findings:

27. In 2010, Husband earned $227,456.88, pursuant to his Form W-2.
28. In 2011, Husband earned $252,051.93 through his employment with Eli Lilly Company. This included $169,339.88 in regular income, and $87,712.05 in incentive income. Of the total $252,051.93 earned, $44,659.85 was the Corporate Bonus Plan based on his 2010 performance.
29. In March, 2012, Husband received his Corporate Bonus Plan award based on his performance in 2011 in the amount of $50,272.69. This is in addition to a Performance Award in the amount of $19,128.40, all of which are in addition to his regular salary.
30. Husband has received a bonus each of the five (5) years preceding the date of separation.
31. Husband is able to work to his full capacity.
32. Husband remains employed at Eli Lilly Company.
33. The Court finds that Husband's incentive income is regular income for purposes of calculating child support.
34. The Court finds that Husband's 2011 Income is an accurate number to ascribe to Husband for purposes of calculating child support.
35. For purposes of calculating child support, Husband earns $4,847.15 per week.
….
73. Between Wife's two businesses—Ellen Gregory Law and EDG Properties—Wife earned a net profit in 2011 of $70,190.35. Wife is self-employed and therefore pays twice the FICA tax.
74. Wife receives approximately $13,000 annually from her Mother as a gift. Wife has received these checks for about twelve consecutive years, and believes this will continue in the future. The Court finds that the annual gifts to Wife from her mother are a reliable form of income for purposes of calculating child support[.]
75. The Court finds that Wife's 2011 income from her law practice and rental property business are a reliable indication of her income for purposes of child support.
76. The Court finds that for purposes of calculating child support, neither party receives investment income.

17

77. The Court finds that for purposes of calculating child support, one-half the FICA tax as a result of Wife's self-employment should be subtracted from her income to calculate her adjusted total income. The calculation is as follows:

ADJUSTMENT FOR ASSUMED TAX RATE PER GUIDELINES FOR WIFE'S INCOME

| | |
|---|---|
| Wife's Income | $70,190 |
| Wife's Adjusted Employment Tax (1/2) | -$6,082 |
| Wife's Adjusted Income | $64,109 |
| *x Assumed Tax Rate - Based on 2010 1040 (32%)* | $20,515 |
| *x Guideline Tax Rate (21.88%)* | $14,027 |
| *Adjusted Tax* | $6,488 |
| ADJUSTED TOTAL INCOME | $57,621 |
| Divided by 52 weeks | $1,108 |

78. In addition to the $1,108 from self-employment income per week, the Court finds that $250 per week for the annual gifts from Carolyn Davis should be imputed as income to Wife.

79. The Court finds that, for purposes of child support, Wife's income is $1,358 per week.

….

81. The parties stipulated that "For purposes of child support, Wife is deemed the party paying controlled expenses."

….

83. Child Support should be calculated in accordance with the Indiana Child Support Rules and Guidelines.

84. With the application of the Court's findings herein, the recommended child support obligation after the application of the Indiana Child Support Rules and Guidelines is $317 per week from Husband to Wife.

Appellant's App. pp. 15, 21-23. In the trial court's order on Husband's motion to correct error, Husband's child support obligation was revised to be $291.00 per week. Husband makes several separate contentions of abuse of discretion.

**A. Tax Treatment of Wife's Self-Employment Income**

18

Husband contends that the trial court miscalculated the FICA deduction from Wife's self-employment income by crediting her with an improperly high deduction. Wife does not directly respond to this contention. The Indiana Child Support Guidelines provide, in relevant part, that

> Weekly Gross Income from self-employment, operation of a business, rent, and royalties is defined as gross receipts minus ordinary and necessary expenses.
> ....
> The self-employed shall be permitted to deduct that portion of their FICA tax payment that exceeds the FICA tax that would be paid by an employee earning the same Weekly Gross Income.

Ind. Child Support Guideline 3(A)(1).

> The commentary to Guideline 3 contains the following:

> The self-employed pay FICA tax at twice the rate that is paid by employees. At present rates, the self-employed pay fifteen and thirty one-hundredths percent (15.30%) of their gross income to a designated maximum, while employees pay seven and sixty-five one-hundreths percent (7.65%) to the same maximum. The self-employed are therefore permitted to deduct one-half of their FICA payment when calculating Weekly Gross Income.

Child Supp. G. 3(A), cmt. (2)(a).

We agree with Husband on this point. The amount deducted by the trial court, $6082, is approximately 8.67% of Wife's 2011 income, not the default 7.65% mentioned in the comments to the Guidelines. Wife identifies nothing in the record that would justify this deviation, and our review has revealed nothing. Husband has established that the trial court miscalculated the FICA deduction Wife was entitled to receive for child support purposes, and we remand with instructions to give her a FICA deduction of 7.65%.

19

Husband also contends that the trial court improperly deviated from the Guideline-mandated presumption of a 21.88% overall tax rate, giving her an additional deduction based on an estimated 2011 tax rate of 32%, her 2010 rate.[2]  We agree with Husband that this deviation is not supported by the trial court's findings or the record.  Husband and Wife filed a joint return in 2010, when Wife earned $52,836 and Husband earned $227,457, for a total gross salary of $280,293.  There is no evidence that Wife would pay anywhere near 32% on her much lower self-employment income, either in 2011 or beyond.  We remand with instructions for the trial court to recalculate Wife's income for purposes of child support by using the Guideline default tax rate of 21.88% or issue findings justifying a deviation.

## B.  Wife's 2011 EDG Properties Income

Husband contends that the trial court erroneously calculated Wife's income from her condominium rental business.  Wife testified that EDG Properties lost $10,157 and introduced documentary evidence to that effect.  Husband suggests that we should carefully scrutinize other documentary exhibits, which would lead to the conclusion that EDG Properties did not, in fact, post a loss for 2011.  This is an invitation to reweigh the evidence, which we will not do.

## C.  Wife's 2012 Law Practice Income

Husband contends that the trial court abused its discretion in not basing its child support order upon Wife's projected 2012 income.  Husband points to evidence

---

[2] As Husband points out, the trial court did not give *him* a deduction for child support purposes based on a 32% tax rate.

20

suggesting that Wife stood to earn significantly more in 2012 from her law practice than in previous years, up to, perhaps, approximately $96,000. This, again, is nothing more than an invitation to reweigh the evidence. Based on Wife's income history, we cannot say that using her 2011 earnings to determine her income for child support purposes was an abuse of discretion.

### D. Husband's 2012 Income

Husband contends that the trial court abused its discretion in not using his projected 2012 income in calculating his child support obligations, pointing to evidence that he was to earn less in 2012 than he had in 2011. Again, we cannot say that the trial court abused its discretion in this regard. Despite Husband's argument to the contrary, his earning history does, in fact, show a general upward trend, even if he earned less in 2012 than he did in 2011.

### E. Husband's Bonus Income

Husband contends that the trial court abused its discretion in essentially assuming that he would continue to receive his non-guaranteed bonus income. Based on Husband's history and the fact that he has received significant bonus income for several years running, however, we cannot say that the trial court abused its discretion in this regard. Once again, Husband's argument is nothing more than an invitation to reweigh the evidence, which we will not do.

### F. Husband's Request to Impute Income to Wife

Finally, Husband contends that the trial court abused its discretion in refusing to impute income to Wife, arguing essentially that the trial court gave too much weight to

evidence regarding Wife's health problems.[3] We will not accept Husband's latest request to reweigh the evidence.

### III. The Children's Accounts

Husband contends that the trial court erroneously failed to include or factor the Children's Accounts into the marital estate. The Children's Accounts, held by either C.G. or A.G., are valued as listed below:

| | |
|---|---|
| Chase CD x8928 | $14,823.16 [(A.G.)] |
| Chase CD x7623 | $13,817.77 [(A.G.)] |
| Chase CD x6925 | (Closed) |
| Chase CD x6982 | (Closed) |
| Chase CD x7624 | $13,891.77 [(C.G.)] |
| Chase CD x3044 | $12,259.41 [(C.G.)] |
| Fidelity UTMA x5252 | $142,536.53 [(A.G.)] |
| Fidelity UTMA x5244 | $156,439.45 [(C.G.)] |
| Fidelity UTMA x0903 | $25,355.76 |
| Fidelity UTMA x0911 | $13,102.62 |
| Bank of Internet x5327 | $13,995.19 [(A.G.)] |
| Bank of Internet x5319 | $14,643.46 [(C.G.)] |

Appellant's App. p. 37. Husband makes three separate arguments related the Children's Accounts

---

[3] We remind Husband that he may petition for a modification of his child support order pursuant to Indiana Code section 31-16-8-1, which reads in relevant part as follows:

(a) Provisions of an order with respect to child support or an order for maintenance (ordered under IC 31-16-7-1 or IC 31-1-11.5-9(c) before their repeal) may be modified or revoked.
(b) Except as provided in section 2 of this chapter, modification may be made only:
(1) upon a showing of changed circumstances so substantial and continuing as to make the terms unreasonable; or
(2) upon a showing that:
(A) a party has been ordered to pay an amount in child support that differs by more than twenty percent (20%) from the amount that would be ordered by applying the child support guidelines; and
(B) the order requested to be modified or revoked was issued at least twelve (12) months before the petition requesting modification was filed.

## A. Failure to Include Children's Accounts in the Marital Estate

Husband contends that the trial court should have included the Children's Accounts in the marital estate, mostly because Husband and Wife allegedly had discretion to use at least some of the funds. This argument need not detain us long. Husband concedes in his brief that Wife's mother "could have gifted funds immediately and absolutely to the children by trust or UTMA[.]" Appellant's Br. p. 43. The record indicates that this is precisely what happened. The trial court found that "[a] valid *prima facie* transfer was made to the children in that each account was pursuant to the UTMA, and listed Wife as custodian for either [A.G. or C.G.]." Appellant's App. p. 44. Although Husband disputes that the transfers occurred pursuant to the UTMA, his argument is nothing more than an invitation to reweigh the evidence, which we will not do. The trial court correctly excluded the Children's Accounts from the marital estate.

## B. Exclusion as Factor in Marital Estate Division

Husband notes that not all of the money in the Children's Accounts was provided by Wife's mother, as $55,000 came from the State Street Account, $10,000 came from the parties' joint account, and $12,000 came from Wife. Husband claims to have neither known nor approved of the transfers and seems to suggest that they amounted to some sort of dissipation of the marital estate on Wife's part. While we recognize that "[o]ne spouse's claim of improvident spending by the other spouse can be a powerful weapon in an attempt to secure a larger share of the marital estate[,]" it is also true that "a trial court presiding over a dissolution proceeding in which dissipation is an issue should not be required to perform an audit of expenditures made during the marriage in order to

23

determine which spouse was the more prudent investor and spender." *In re Marriage of Coyle*, 671 N.E.2d 938, 942 (Ind. Ct. App. 1996) (citation omitted). Evidence that Husband neither knew nor approved of the transfers, however, is evidence that does not support the trial court's judgment. As such, we may not consider it. Husband has failed to establish that the trial court abused its discretion in this regard.

## IV. Education Expenses

### A. Order for Parties to Pay for Children to Continue to Attend Park Tudor

Husband contends that the trial court ordered that the parties pay all costs and expenses for the Children to continue at Park Tudor without properly considering all factors. Indiana Code section 31-16-6-2 provides as follows:

> (a) The child support order or an educational support order may also include, where appropriate:
>> (1) amounts for the child's education in elementary and secondary schools and at postsecondary educational institutions, taking into account:
>>> (A) the child's aptitude and ability;
>>> (B) the child's reasonable ability to contribute to educational expenses through:
>>>> (i) work;
>>>> (ii) obtaining loans; and
>>>> (iii) obtaining other sources of financial aid reasonably available to the child and each parent; and
>>> (C) the ability of each parent to meet these expenses;
>> (2) special medical, hospital, or dental expenses necessary to serve the best interests of the child; and
>> (3) fees mandated under Title IV-D of the federal Social Security Act (42 U.S.C. 651 through 669).
> (b) If the court orders support for a child's educational expenses at a postsecondary educational institution under subsection (a), the court shall reduce other child support for that child that:
>> (1) is duplicated by the educational support order; and
>> (2) would otherwise be paid to the custodial parent.

Indiana Child Support Guideline 8(a) provides as follows:

**Elementary and Secondary Education.** If the expenses are related to elementary or secondary education, the court may want to consider whether the expense is the result of a personal preference of one parent or whether both parents concur; if the parties would have incurred the expense while the family was intact; and whether or not education of the same or higher quality is available at less cost.

Husband contends that the trial court failed to properly consider the Children's ability to pay for their elementary and secondary educations and whether education of the same or higher quality than the one provided by Park Tudor is available at a lower cost. It is well-settled, however, that a trial court need not consider the statutory factors if the parties have agreed to share the costs of a private education. *See, e.g.*, *Clark v. Madden*, 725 N.E.2d 100, 106 (Ind. Ct. App. 2000) ("[W]e conclude that, based on both case law and statute, there must be either an agreement between parents or a court finding regarding the statutory factors discussed above before a court may order private school expenses to be paid post-dissolution."). We conclude that the record supports the trial court's seeming conclusion that such an agreement existed.

The trial court made the following findings regarding the Children's education:

113. The minor children … attend Park Tudor Schools, which is a Private School in Indianapolis, Indiana.
114. There are costs incurred for the minor children to attend Park Tudor, including tuition, field trip fees, technology fees, lunch fees, and other additional expenses. Tuition is paid on a quarterly basis. The other expenses are invoiced on a monthly basis.
115. Wife wishes for children to continue to attend Park Tudor.
116. [The Children] have benefitted from attending Park Tudor, in that they receive more individualized attention from the teachers. Park Tudor also offers a fine arts program, in which the children participate. [The Children] have thrived at Park Tudor.

25

117.  Husband also wishes that the children [] continue to attend Park Tudor.  Further, in the *Provisional Stipulations*, the parties agreed that the children would continue to attend Park Tudor Schools.

118.  Wife's parents paid for her tuition for both her undergraduate and doctoral degrees.

119.  Husband's parents paid for his undergraduate degree.  Wife paid the large majority of Husband's tuition for his graduate degree.

120.  The parties agree that they wish for the minor children to attend post-high school education.  Both Wife and Husband place a high value on education.

121.  The parties have paid the cost for private school out of their joint checking account.

122.  The Joint Checking Account was funded by the deposit of the parties' employment income and earnings.  Gifts from Wife's mother were not used to pay the costs for Park Tudor or any extraordinary educational expenses.

123.  In 2004, Wife opened two 529 Accounts for the purpose of paying the children's post-high school education, one such account for each child.

….

125.  In 2009, Husband opened two 529 Accounts, held with Schwab, one for each child.

….

128.  Wife opened the Fidelity 529 Accounts with the intention that they would be the primary funding accounts used for post-high school education expenses for the children.  Husband opened the Schwab 529 Accounts with the intention that they would be used for post-high school education costs.

129.  The Court finds that the parties shall pay all costs and expenses for the children to continue to attend Park Tudor.  These costs include tuition, field trip fees, technology fees, lunch fees, and other additional expenses included in the monthly invoice from Park Tudor.  The Court finds that these costs shall be divided by the parties at their Guideline Percentages, with Husband paying 78% and Wife paying 22%.

Appellant's App. pp. 32-34 (emphasis in original).

First and foremost, the trial court found, and Husband does not dispute, that he wishes the Children to continue attending Park Tudor.  In our view, this, along with Husband's agreement to fund the Children's Park Tudor education in the Provisional

Order, is sufficient to support an inference that he intended to fund their education post-dissolution. Additionally, both parties contributed to the Children's education during the marriage, further supporting the inference that Husband intended to continue to do so. Finally, the trial court's finding that Husband established 529 accounts with the intent that the accounts fund the Children's post-secondary education further indicates that Husband intended to fund, at least partially, their elementary and secondary education. The trial court did not abuse its discretion in ordering Husband to pay a portion of the Children's costs to attend Park Tudor.

### B. Conflicting Orders

Husband contends that the order for him to pay 78% of all education costs conflicts with the trial court's order that Wife pay controlled expenses. The commentary to Child Support Guideline 6 indicates that "[c]ontrolled expenses are items like clothing, education, school books and supplies, ordinary uninsured health care and personal care." Husband has not established that the orders are necessarily in conflict. For example, education, which is listed as a controlled expense, is an expense shared by the parties in this case. We see no clear error in requiring Husband to share other education-related expenses, even if they might be considered controlled expenses in another case.

Finally, Husband notes that the trial court's child support worksheet attached to its order on his motion to correct error listed his share of weekly adjusted gross income at 75%, as opposed to the 78% listed on the superseded worksheet. Although the trial court used the new worksheet to adjust Husband's child support obligations, it erred in not similarly adjusting his education obligations. Wife does not address this particular

contention, and in such cases we employ a different standard of review. "We are under no obligation to undertake the burden of developing an argument for the appellee." *McKinney v. McKinney*, 820 N.E.2d 682, 685 (Ind. Ct. App. 2005). "We may, therefore, reverse the trial court if the appellant establishes prima facie error." *Id*. "'Prima facie' is defined as 'at first sight, on first appearance, or on the face of it.'" *Id*. (citation omitted). We conclude that Husband has established *prima facie* error. The trial court offered no reason why it did not adjust Husband's education obligation to 75% of all expenses, and we can think of none that would justify a failure to adjust the obligation. We therefore remand with instructions to adjust Husband's obligation to 75%.

### CONCLUSION

We affirm the trial court's unequal division of the marital estate, its decision not to include the Children's Accounts in the marital estate, and its order that Husband pay a portion of the Children's education costs. We remand, however, for the recalculation of Wife's income pursuant to our instructions in section II.A. and for the resetting of Husband's educational obligation to 75% of all costs pursuant to our instructions in section IV.B.

The judgment of the trial court is affirmed in part, reversed in part, and remanded with instructions.

MATHIAS, J., and PYLE, J., concur.